BATES ᴇᴛ ᴀʟ. *v.* CITY OF LITTLE ROCK ᴇᴛ ᴀʟ.

No. 41.   Argued November 18, 1959.—
Decided February 23, 1960.

*Robert L. Carter* argued the cause for petitioners. With him on the brief was *George Howard, Jr.*

*Joseph C. Kemp* argued the cause for the City of Little Rock, respondent. With him on the brief was *C. Richard Crockett.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Each of the petitioners has been convicted of violating an identical ordinance of an Arkansas municipality by refusing a demand to furnish city officials with a list of the names of the members of a local branch of the National Association for the Advancement of Colored People. The question for decision is whether these convictions can stand under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Municipalities in Arkansas are authorized by the State to levy a license tax on any person, firm, individual, or corporation engaging in any "trade, business, profession, vocation or calling" within their corporate limits.[1] Pursuant to this authority, the City of Little Rock and the City of North Little Rock have for some years imposed annual license taxes on a broad variety of businesses, occupations, and professions.[2] Charitable organizations which engage in the activities affected are relieved from paying the taxes.

In 1957 the two cities added identical amendments to their occupation license tax ordinances. These amendments require that any organization operating within the municipality in question must supply to the City Clerk,

---

[1] Ark. Stat., 1947, § 19–4601.

[2] Little Rock Ord. No. 7444. North Little Rock Ord. No. 1786. These ordinances have been amended numerous times by adding various businesses, occupations and professions to be licensed, and by changing the rates of the taxes imposed.

upon request and within a specified time, (1) the official name of the organization; (2) its headquarters or regular meeting place; (3) the names of the officers, agents, servants, employees, or representatives, and their salaries; (4) the purpose of the organization; (5) a statement as to dues, assessments, and contributions paid, by whom and when paid, together with a statement reflecting the disposition of the funds and the total net income; (6) an affidavit stating whether the organization is subordinate to a parent organization, and if so, the latter's name. The ordinances expressly provide that all information furnished shall be public and subject to the inspection of any interested party at all reasonable business hours.[3]

[3] The pertinent provisions of the ordinances are as follows:

"Whereas, it has been found and determined that certain organizations within the City . . . have been claiming immunity from the terms of [the ordinance], governing the payment of occupation licenses levied for the privilege of doing business within the city, upon the premise that such organizations are benevolent, charitable, mutual benefit, fraternal or non-profit, and

"Whereas, many such organizations claiming the occupation license exemption are mere subterfuges for businesses being operated for profit which are subject to the occupation license ordinance;

"Now, Therefore, Be It Ordained by the City Council of the City . . . .

"Section 1. The word 'organization' as used herein means any group of individuals, whether incorporated or unincorporated.

"Section 2. Any organization operating or functioning within the City . . . including but not limited to civic, fraternal, political, mutual benefit, legal, medical, trade, or other organization, upon the request of the Mayor, Alderman, Member of the Board of Directors, City Clerk, City Collector, or City Attorney, shall list with the City Clerk the following information within 15 days after such request is submitted:

"A. The official name of the organization.

"B. The office, place of business, headquarters or usual meeting place of such organization.

[Footnote 3 continued on p. 519.]

Petitioner Bates was the custodian of the records of the local branch of the National Association for the Advancement of Colored People in Little Rock, and petitioner Williams was the custodian of the records of the North Little Rock branch. These local organizations supplied the two municipalities with all the information required by the ordinances, except that demanded under § 2E of each ordinance which would have required disclosure of the names of the organizations' members and contributors. Instead of furnishing the detailed breakdown required by this section of the North Little Rock ordinance, the petitioner Williams wrote to the City Clerk as follows:

---

"C. The officers, agents, servants, employees or representatives of such organization, and the salaries paid to them.

"D. The purpose or purposes of such organization.

"E. A financial statement of such organization, including dues, fees, assessments and/or contributions paid, by whom paid, and the date thereof, together with the statement reflecting the disposition of such sums, to whom and when paid, together with the total net income of such organization.

"F. An affidavit by the president or other officiating officer of the organization stating whether the organization is subordinate to a parent organization, and if so, the name of the parent organization.

"Section 3. This ordinance shall be cumulative to other ordinances heretofore passed by the City with reference to occupation licenses and the collection thereof.

"Section 4. All information obtained pursuant to this ordinance. shall be deemed public and subject to the inspection of any interested party at all reasonable business hours.

"Section 5. Any section or part of this ordinance declared to be unconstitutional or void shall not affect the remaining sections of the ordinance, and to this end the sections or subsections hereof are declared to be severable.

"Section 6. Any person or organization who shall violate the provisions of this ordinance shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined . . . ."

"E. The financial statement is as follows:

*January 1, 1957 to December 4, 1957.*

Total receipts from membership and contributors $252.00.

| | |
|---|---|
| Total expenditures.................. | $183.60 |
| (to National Office) | |
| Secretarial help....................... | 5.00 |
| Stationery, stamps, etc............... | 3.00 |
| Total ........................... | $191.60 |
| On Hand........................... | 60.40 |

"F. I am attaching my affidavit as president indicating that we are a Branch of the National Association for the Advancement of Colored People, a New York Corporation.

"We cannot give you any information with respect to the names and addresses of our members and contributors or any information which may lead to the ascertainment of such information. We base this refusal on the anti-NAACP climate in this state. It is our good faith and belief that the public disclosure of the names of our members and contributors might lead to their harassment, economic reprisals, and even bodily harm. Moreover, even aside from that possibility, we have been advised by our counsel, and we do so believe that the city has no right under the Constitution and laws of the United States, and under the Constitution and laws of the State of Arkansas to demand the names and addresses of our members and contributors. We assert on behalf of the organization and its members the right to contribute to the NAACP and to seek under its aegis to accomplish the aims and purposes herein described free from any restraints or interference from city or state officials. In addition we assert the right of our

members and contributors to participate in the activities of the NAACP, anonymously, a right which has been recognized as the basic right of every American citizen since the founding of this country. . . ."

A substantially identical written statement was submitted on behalf of the Little Rock branch of the Association to the Clerk of that city.

After refusing upon further demand to submit the names of the members of her organization,[4] each petitioner was tried, convicted, and fined for a violation of the ordinance of her respective municipality At the Bates trial evidence was offered to show that many former members of the local organization had declined to renew their membership because of the existence of the ordinance in question.[5] Similar evidence was received in the Williams

---

[4] Section 2E of the ordinances does not explicitly require submission of membership lists, but, rather, of "dues . . . and, or contributions paid, by whom paid . . . ." That the effect of this language was to require submission of the names of all members was made clear in the supplemental request made by the City Clerk of North Little Rock to the petitioner Williams:

"Dear Madam:

"At a regular meeting of the North Little Rock City Council held in the Council Chamber on December 9, 1957, I was instructed to request a list of the names and addresses of all the officers and members of the North Little Rock Branch of the NAACP.

"This portion of the questionaire answered by you on December 4, 1957 did not furnish this information. The above information must be received not later than December 18, 1957 as requested in the original questionaire received by you on December 3, 1957."

. (In fact, the names of all the officers of the North Little Rock branch had already been submitted in accordance with § 2C of the ordinance.)

[5] For example, petitioner Bates testified: "Well, I will say it like this—for the past five years I have been collecting, I guess, 150 to 200 members each year—just renewals of the same people. This year, I guess I lost 100 or 150 of those same members because when I went back for renewals they said, 'Well, we will wait and see what happens in the Bennett Ordinance.' "

trial,[6] as well as evidence that those who had been publicly identified in the community as members of the National Association for the Advancement of Colored People had been subjected to harassment and threats of bodily harm.[7]

On appeal the cases were consolidated in the Supreme Court of Arkansas, and, with two justices dissenting, the convictions were upheld. 229 Ark. 819, 319 S. W. 2d 37. The court concluded that compulsory disclosure of the membership lists under the circumstances was "not an unconstitutional invasion of the freedoms guaranteed . . ." but "a mere incident to a permissible legal result."[8] Because of the significant constitutional question involved, we granted certiorari. 359 U. S. 988.

Like freedom of speech and a free press, the right of peaceable assembly was considered by the Framers of our Constitution to lie at the foundation of a government

---

[6] For example, a witness testified: "Well, the people are afraid to join, afraid to join because the people—they don't want their names exposed and they are afraid their names will be exposed and they might lose their jobs. They will be intimidated and they are afraid to join. They said, 'Well, you will have to wait. I can't do it.' They are afraid to give their—because they are afraid somebody, if their names are publicized, then they will lose their jobs or be intimidated or what-not."

[7] For example, petitioner Williams testified: "Well, I have—we were not able to rest at night or day for quite a while. We had to have our phone number changed because they call that day and night and then we—they have found out the second phone number and they did the same way and they called me all hours of night over the telephone and then I had to get a new number and they have been trying to find out that one, of course. I would tell them who is talking and they have throwed stones at my home. They wrote me—I got a—I received a letter threatening my life and they threaten my life over the telephone. That is the way."

[8] The Arkansas Supreme Court construed § 2E of the ordinances as requiring disclosure "of the membership list." 229 Ark., at ——, 319 S. W. 2d, at 41.

based upon the consent of an informed citizenry—a government dedicated to the establishment of justice and the preservation of liberty. U. S. Const., Amend. I. And it is now beyond dispute that freedom of association for the purpose of advancing ideas and airing grievances is protected by the Due Process Clause of the Fourteenth Amendment from invasion by the States. *De Jonge* v. *Oregon,* 299 U. S. 353, 364; *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, 460.

Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference. *Grosjean* v. *American Press Co.,* 297 U. S. 233; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402; *N. A. A. C. P.* v. *Alabama, supra; Smith* v. *California,* 361 U. S. 147. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association. . . . This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *N. A. A. C. P.* v. *Alabama,* 357 U. S., at 462.

On this record it sufficiently appears that compulsory disclosure of the membership lists of the local branches of the National Association for the Advancement of Colored People would work a significant interference with the freedom of association of their members.[9] There was

---

[9] The cities do not challenge petitioners' right to raise any objections or defenses available to their organizations, nor do the cities challenge the right of the organizations in these circumstances to assert the individual rights of their members. Cf. *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, at 458–459.

substantial uncontroverted evidence that public identification of persons in the community as members of the organizations had been followed by harassment and threats of bodily harm. There was also evidence that fear of community hostility and economic reprisals that would follow public disclosure of the membership lists had discouraged new members from joining the organizations and induced former members to withdraw. This repressive effect, while in part the result of private attitudes and pressures, was brought to bear only after the exercise of governmental power had threatened to force disclosure of the members' names. *N. A. A. C. P.* v. *Alabama,* 357 U. S., at 463. Thus, the threat of substantial government encroachment upon important and traditional aspects of individual freedom is neither speculative nor remote.

Decision in this case must finally turn, therefore, on whether the cities as instrumentalities of the State have demonstrated so cogent an interest in obtaining and making public the membership lists of these organizations as to justify the substantial abridgment of associational freedom which such disclosures will effect. Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling. *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449. See also *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Schneider* v. *State,* 308 U. S. 147; *Cox* v. *New Hampshire,* 312 U. S. 569, 574; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Prince* v. *Massachusetts,* 321 U. S. 158; *Kovacs* v. *Cooper,* 336 U. S. 77.

It cannot be questioned that the governmental purpose upon which the municipalities rely is a fundamental one. No power is more basic to the ultimate purpose and function of government than is the power to tax. See *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 150. Nor can it be doubted that the proper and efficient exercise of this

essential governmental power may sometimes entail the possibility of encroachment upon individual freedom. See *United States v. Kahriger,* 345 U. S. 22; *Hubbard* v. *Mellon,* 55 App. D. C. 341, 5 F. 2d 764.

It was as an adjunct of their power to impose occupational license taxes that the cities enacted the legislation here in question.[10] But governmental action does not automatically become reasonably related to the achievement of a legitimate and substantial governmental purpose by mere assertion in the preamble of an ordinance. When it is shown that state action threatens significantly to impinge upon constitutionally protected freedom it becomes the duty of this Court to determine whether the action bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification.

In this record we can find no relevant correlation between the power of the municipalities to impose occupational license taxes and the compulsory disclosure and publication of the membership lists of the local branches of the National Association for the Advancement of Colored People. The occupational license tax ordinances of the municipalities are squarely aimed at reaching all the commercial, professional, and business occupations within the communities. The taxes are not, and as a matter of state law cannot be, based on earnings or income, but upon the nature of the occupation or enterprise conducted.

Inquiry of organizations within the communities as to the purpose and nature of their activities would thus appear to be entirely relevant to enforcement of the ordinances. Such an inquiry was addressed to these organizations and was answered as follows:

> "We are an affiliate of a national organization seeking to secure for American Negroes their rights as

---

[10] See note 3, *supra.*

526

guaranteed by the Constitution of the United States. Our purposes may best be described by quoting from the Articles of Incorporation of our National Organization where these purposes are set forth as:

"'. . . voluntarily to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States; to advance the interest of colored citizens; to secure for them impartial suffrage; and to increase their opportunities for securing justice in the courts, education for their children, employment according to their ability, and complete equality before the law. To ascertain and publish all facts bearing upon these subjects and to take any lawful action thereon; together with any kind and all things which may lawfully be done by a membership corporation organized under the laws of the State of New York for the further advancement of these objects.'

"The Articles of Incorporation hereinabove referred to are on file in the office of the Secretary of State of the State of Arkansas. In accord with these purposes and aims, [this] . . . Branch, NAACP was chartered and organized, and we are seeking to effectuate these principles within [this municipality]."

The municipalities have not suggested that an activity so described, even if conducted for profit, would fall within any of the occupational classifications for which a license is required or a tax payable. On oral argument counsel for the City of Little Rock was unable to relate any activity of these organizations to which a license tax might attach.[11] And there is nothing in the record to indicate

[11] A "catch-all" provision of the Little Rock ordinance imposes an annual tax upon "[a]ny person, firm, or corporation within the City . . . engaging in the business of selling any and all kinds of goods, wares, and merchandise, whether raw materials or finished products, or both, from a regularly established place of business main-

that a tax claim has ever been asserted against either organization. If the organizations were to claim the exemption which the ordinance grants to charitable endeavors, information as to the specific sources and expenditures of their funds might well be a subject of relevant inquiry. But there is nothing to show that any exemption has ever been sought, claimed, or granted—and positive evidence in the record to the contrary.

In sum, there is a complete failure in this record to show (1) that the organizations were engaged in any occupation for which a license would be required, even if the occupation were conducted for a profit; (2) that the cities have ever asserted a claim against the organizations for payment of an occupational license tax; (3) that the organizations have ever asserted exemption from a tax imposed by the municipalities, either because of their alleged nonprofit character or for any other reason.

We conclude that the municipalities have failed to demonstrate a controlling justification for the deterrence of free association which compulsory disclosure of the membership lists would cause. The petitioners cannot be punished for refusing to produce information which the municipalities could not constitutionally require. The judgments cannot stand.

*Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS, concurring.

We concur in the judgment and substantially with the opinion because we think the facts show that the ordinances as here applied violate freedom of speech and

tained within the City . . . ." The tax is measured by "the gross value of the average stock inventory for the preceding year," with a minimum of $25. It was conceded on oral argument by counsel for the City of Little Rock that this provision was inapplicable. No brief was filed nor oral argument made on behalf of the City of North Little Rock.

assembly guaranteed by the First Amendment which this Court has many times held was made applicable to the States by the Fourteenth Amendment, as for illustration in *Jones* v. *Opelika,* 316 U. S. 584, at 600, dissenting opinion adopted by the Court in 319 U. S. 103; *Murdock* v. *Pennsylvania,* 319 U. S. 105, at 108; *Kingsley Corp.* v. *Regents,* 360 U. S. 684. And see cases cited in *Speiser* v. *Randall,* 357 U. S. 513, 529, at 530 (concurring opinion).

Moreover, we believe, as we indicated in *United States* v. *Rumely,* 345 U. S. 41, 48, at 56 (concurring opinion), that First Amendment rights are beyond abridgment either by legislation that directly restrains their exercise or by suppression or impairment through harassment, humiliation, or exposure by government. One of those rights, freedom of assembly, includes of course freedom of association; and it is entitled to no less protection than any other First Amendment right as *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, at 460, and *De Jonge* v. *Oregon,* 299 U. S. 353, at 363, hold. These are principles applicable to all people under our Constitution irrespective of their race, color, politics, or religion. That is, for us, the essence of the present opinion of the Court.