Bennett, Atty. General *v.* N.A.A.C.P.

5-2575                                        370 S. W. 2d 79

Opinion delivered June 3, 1963.

[Rehearing denied September 9, 1963.]

*Bruce Bennett,* Atty. General, by *Jack L. Lessenberry,* Asst. Atty. General and *John T. Jernigan,* Prosecuting Attorney, for appellant.

*George Howard, Jr., Robert L. Carter* and *Maria L. Marcus,* New York, N.Y., for appellee.

Ed. F. McFaddin, Associate Justice. This appeal poses the question of the constitutionality of four Acts adopted at the Second Extraordinary Session[1] of the 1958 General Assembly of Arkansas. The Acts adopted at that session, and here involved, are: Act No. 12, which

[1] The session convened on August 26, 1958, pursuant to a Proclamation of the Governor, which called the session "To consider and, if so advised, enact laws for the following purposes: 1. To regulate the administration and financing of public school and education, and to make appropriation for such purposes. 2. To make appropriation to pay the expenses and per diem of this Extraordinary Session of the General Assembly."

empowered the county judge of any county to require certain organizations engaged in specified activities connected with the schools to furnish stated and required information; Act No. 13, which empowered the Attorney General of Arkansas to obtain access to the files, records, correspondence, etc. of certain organizations; Act No. 14, which added additional definitions to the crime of barratry and prescribed penalties; and Act No. 16, which added additional definitions to the crime of maintenance and prescribed penalties. The full text of each of these Acts may be found in Pages 2023 *et seq.* of Volume 2 of the printed Acts of the 1959 General Assembly.

The National Association for the Advancement of Colored People, joined with some of its officers, filed this suit in the Pulaski Chancery Court, seeking a declaratory judgment to the effect that each of the four Acts was unconstitutional.[2] The defendants in this suit were the Attorney General of Arkansas, the Prosecuting Attorney of the District of which Pulaski County is a part, and the County Judge of Pulaski County. Upon issues joined, the cause was heard *ore tenus,* and the Chancery decree was that Acts 12, 14 and 16 were unconstitutional, and that Act No. 13 was valid. The correctness of that decree is challenged by both direct and cross appeal.[3]

I. *A Justiciable Issue.* At the outset, the Attorney General insists that this is not a proper case for a declaratory judgment because there is no effort being made

---

[2] The prayer of the complaint was, *inter alia,* for ". . . a judgment or decree declaring Acts Nos. 12, 13, 14, and 16 of the 1958 Second Extraordinary Session of the General Assembly to be unconstitutional, in that these measures deny to plaintiffs, the classes they represent, contributors, and lawyers engaged in acting in good faith, the equal protection and due process guaranteed by the 14th Amendment to the Constitution of the United States."

[3] We have delayed our decision in this case because of the pendency in the Supreme Court of the United States of the case of *NAACP* v. *Robert Y. Button, Attorney General of Virginia,* which involved a barratry statute of Virginia similar to our Acts 14 and 16. The Supreme Court of the United States decided the case of *National Association for the Advancement of Colored People* v. *Button, Attorney General of Virginia,* on January 14, 1963. See 371 U.S. 415, 9 L. ed. 2d 405, 83 S. Ct. 328.

by anyone to proceed against the plaintiffs (appellees) under any of these Acts. This insistence fails to meet the issue. The NAACP first filed suit in the United States District Court for the Western Division of the Eastern District of Arkansas and challenged the four Acts here involved. A three-Judge Federal Court held, on October 8, 1959, that the NAACP should first proceed in the Arkansas Courts.[4] The NAACP and the other plaintiffs then filed this present suit for declaratory judgment in the Pulaski Chancery Court, and we hold— as did the Chancellor—that a justiciable controversy is presented.

II. *Acts Nos. 12, 14 and 16.* The Chancery Court held each of these Acts to be unconstitutional; and we quote the Chancellor's opinion on each of these Acts:

## "ACT NO. 12.

"Act No. 12 has for its stated purpose the maintaining of law, peace and order in the administration of public schools. Briefly it provides that whenever any organization (which includes civic, fraternal, political, mutual benefit, medical, trade or other kind) engaged in 'activities designed to hinder, harass and interfere with powers and duties of the State of Arkansas to control and operate its public schools' the County Judge may 'request' that the organization file with the County Clerk certain information, under oath, revealing the name, members, officers and purposes of the organization. Assumedly an objectionable feature of the Act is the requirement that a list of the members must be made public, thus depriving the members of their asserted right to privacy. . . .

"Regardless of how laudable its purpose, Act No. 12 is too broad in its scope to meet constitutional requirements. Under its plain language, any organization which questions the State's 'power or duty' in the opera-

---

[4] The memorandum opinion of the three-Judge Federal Court is in the transcript before us; and the Judges on that Court were Circuit Judge John B. Sanborn, and District Judges John E. Miller and J. Smith Henley.

tion of the public schools must comply with its provisions and subject its members to publication of their names. It is fundamental that every citizen has the legal and inherent right to access to the Courts to question in a lawful and peaceable manner any action of the State in the exercise of any of its powers and duties. This applies to the action of the State, not only with regards to the public schools, but to any other activity in which it may exercise its powers and duties. The effect of Act No. 12 is to subject any organization whose members desire to seek a ruling of the Court on the legality or constitutionality of the action of the State towards the public schools or with relation to the public schools to publicity which to some constitutes harassment. Any act of the Legislature which has as its purpose or effect the denial of the right of the citizen to free and untrammeled access to the Courts or which seeks by intimidation, vexation or otherwise, to discourage the exercise of that right is plainly unconstitutional. No obstacle can be legally placed between the citizen and his Court. Article 2, Section 13 of the Arkansas Constitution provides:

'Every person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character; he ought to obtain justice freely, and without purchase, completely, and without denial, promptly and without delay, conformably to the laws.'

"By the above language the framers of our Constitution have stated specifically that justice may be obtained without purchase and without vexation, freely and promptly. This right of the citizen cannot be infringed by legislative act. *St. Louis Iron Mtn. Railway* v. *Williams*, 49 Ark. 492; *Riggs Co.* v. *Martin*, 5 Ark. 506. "There is yet another ground upon which this Act must fail. Although under Section 2 the term 'organization' is given a wide definition, under the provisions of Section 3 of the Act only those organizations are required to comply with the terms of that Act which are subject to the 'request' of the County Judge. Thus, the dis-

cretionary act of the County Judge is necessary to bring into play the provisions of the Act against any organization. The applications of the law must not depend upon the uncontrolled discretion of any public official or else there will be an unconstitutional delegation of power prohibited by Article 4, Section 1 of the Arkansas Constitution. The Arkansas Supreme Court has construed that constitutional provision to prohibit the Legislature from delegating to any public official the power to select those against whom state laws shall apply. To avoid the proscription against unconstitutional discrimination the law must apply to all persons within a named class equally and without favor or exception. It must be so complete in all of its terms and provisions when it leaves the legislative branch of the government, that nothing is left to the judgment of any appointee or delegate of the Legislature. *State* v. *Davis,* 178 Ark. 153; 11 Am. Jur. Sec. 215, p. 924.

"For the above reasons, it is the opinion of this Court that Act No. 12 is unconstitutional and invalid . . ."[5]

## "ACTS NO. 14 AND 16

"Acts 14 and 16 will be considered together because they deal with subjects so inter-related that it is almost impossible to consider one without the other.

"The subject of these two Acts are 'Champerty', 'Maintenance' and 'Barratry'.

"Act No. 14 purports to define the crime of barratry and includes nine separate sections of definitions.

"Sub-section B of Section 1 is so vague, indefinite, uncertain, yet inclusive, that it would make difficult or impossible life in a society in relation to access to the judiciary and particularly is this true under a constitu-

---

[5] The Attorney General argues in this Court that any issue about Act No. 12 is moot because—says the Attorney General—Act No. 12 "was entirely superseded by Act No. 225 of 1959." We find no language in said Act No. 225 which expressly or impliedly repeals Act No. 12; so we consider such argument about repeal to be beside the point at issue here.

tional form of government. Acts which may 'tend to breach the peace' are so numerous as to beg description. Our form of government guarantees to all of us the right of free and uninhibited access to the judiciary, and this certainly implies that we must not be so fearful of every day and common acts that this access to the judiciary is actually fettered because of fear. This definition tends to impair freedom of thought and action with relationship of access to the judiciary.

"The proposed definition in Sub-section C of Section 1 makes the single act of proposing that a fellow man litigate, regardless of intention or the merits of the proposed litigation, or regardless of the good intentions of the proposer, a felonious act in this society punishable by heavy fine and imprisonment. It is well established in our law today in this State that a labor union cannot sue or be sued in its own name, but must do so through the individuals or representations of the individuals within that group. It would appear to this Court that if this provision could conceivably be held valid, that this would effectively bar labor unions and other unincorporated associations from access to the judiciary; and, as previously stated, under our Constitution this cannot be done.

"Sub-section D of Section 1 is equally as invalid as are sub-sections B and C aforesaid, and for the same reasons, and in addition the Court would observe that the practice of law would be an extremely hazardous profession to pursue in face of the serious penalties imposed by the Act.

"Sub-sections F, G, H, and I of Section 1 do not make complete sentences or complete thoughts and for that reason define nothing.

"Act No. 16 deals with the common law crimes of maintenance and champerty, as therein greatly enlarged to include the giving, receiving, accepting of assistance or inducements to commence or prosecute any proceeding in any Court or before an administrative agency.

"Once again we call attention to the situation that unincorporated associations would find themselves inhibited, as well as many well intentioned and highly motivated people, in assisting indigent people in defending themselves against criminal charges or in prosecuting or defending civil actions. This definition goes considerably beyond, not only proprietary but constitutional limitations, and clearly violates the 14th Amendment to the Constitution of the United States and Article 2, Section 8 of the Arkansas Constitution.

"Sections 3 and 4 of Act 16 would seemingly destroy and certainly impair the power or right to make contracts between attorney and client.

"Section 5 of Act 16 provides penalties for filing false affidavits as required in Sections 3 and 4; and among other things imposes a heavier and more severe penalty upon non-resident attorneys than it does upon resident attorneys. For this reason the Act is discriminatory and violates the equal protection clause of both the Constitution of Arkansas and the United States.

"Section 6 would require a person to appear before a grand jury and would require testimony to be given regardless of whether such testimony or evidence would tend to incriminate him. This would seem to this Court to violate the Fifth Amendment to the United States Constitution and would also clearly violate Article 2, Section 8 of the Arkansas Constitution.

"Paragraph 7 purports to exempt certain types of litigation from the provisions of Act 16; and in the opinion of this Court constitutes an unlawful classification within a class without reasonable relation and is therefore discriminatory.

"It is the opinion of this Court that both Act No. 14 and Act No. 16 are unconstitutional and invalid."

---

We have quoted the opinion of the learned Chancellor to show the care and study he gave to the issues. There is no need for us to accept or reject the reasoning of the learned Chancellor, because our Acts Nos.

12, 14, and 16 were borrowed from the State of Virginia; and the Courts of that State, along with the Supreme Court of the United States, have finally destroyed the validity of these Acts. The Special Session of the General Assembly of Virginia in 1956 adopted five Chapters, from which we borrowed the language of our Acts Nos. 12, 14, and 16. In the case of *National Association for the Advancement of Colored People* v. *Robert Y. Button, Attorney General of Virginia,* 371 U.S. 415, 9 L. ed. 2d 405, 83 S. Ct. 328, Mr. Justice Brennan, in the Majority Opinion, stated that the Circuit Court of the City of Richmond held most of Chapters 31, 32, and 35 unconstitutional; and that the Supreme Court of Appeals of Virgina, in *NAACP* v. *Harrison,* 116 S. E. 2d 55, held Chapter 36 unconstitutional. So there was left only Chapter 33 on barratry and maintenance. The Supreme Court of the United States in the said Button case held the Virginia Chapter 33 to be unconstitutional; and in his concurring opinion in the Button case, Mr. Justice Douglas lists our Act as being modeled from the Virginia Act. We think the Supreme Court of the United States in the Button case has swept the foundations from under the Acts here involved; so we hold Acts Nos. 12, 14, and 16 to be unconstitutional.

III. *Act No. 13.* The Chancery Court held this Act No. 13 to be constitutional; but we hold that the Act is unconstitutional under the authority of the decision of the Supreme Court of the United States in *Bates* v. *City of Little Rock,* 361 U.S. 516, 4 L. ed. 2d 480, 80 S. Ct. 412. The Act No. 13 provides that if the Attorney General of Arkansas should have reason to believe that any organization was attempting to defraud the State of Arkansas of its taxes, the Attorney General might procure an *ex parte* order from any Chancery Court and have access to all of the files, records, correspondence, and other data of said organization.

When we consider the caption to the Act, the session at which it was adopted, and the circumstances that led to the calling of that session, we are convinced that the Supreme Court of the United States would hold

that the Act was aimed at the NAACP and required a compulsory disclosure of information which was proscribed by the decision of the Supreme Court of the United States in *Bates* v. *City of Little Rock, supra*. The whole tenor of the decision in the case of *NAACP* v. *Button* leads us to the inevitable conclusion that this Act No. 13 would be promptly declared unconstitutional in line with *Bates* v. *City of Little Rock, supra*, and *NAACP* v. *Button, supra*.

It follows that all four of the Acts here involved are hereby declared to be unconstitutional.

HOLT, J., disqualified and not participating.

JOHNSON, J. and BOYD TACKETT, Special J., dissent.

BOYD TACKETT, Special J. (dissenting). Act 12 of the Second Extraordinary Session of the Sixty-First General Assembly of the State of Arkansas, as Amended by Act 225 of the 1959 Legislature, Ark. Stat. 80-1910-14, provides in substance that a County Judge of any county of this state, who believes that any organization operating in the county is engaged in activities designed to hinder, harass and interfere with the powers and duties of the State of Arkansas to control and operate its public schools shall afford a public hearing, after notice is given to the involved organization, to make a determination as to whether such organization operating within the involved county is engaged in such aforementioned activities; and that, upon a determination by the County Judge, after such notice and hearing that the organization is engaged in activities detrimental to the powers and duties of the State of Arkansas to control and operate its public schools, he shall order the organization to file with the office of the County Clerk, within a period of seven days after such order is made, the following: (1) official name of the organization and its list of members, (2) the office, place of business, headquarters or usual meeting place of the organization, (3) the officers, agents, servants, employees, or representatives of the organization, (4) the purpose of the organization, and (5) a statement disclosing whether the organization is subordinate to a parent organization, and, if so, the name of the parent organization. The legislation further provides that the organization shall furnish the required information; and the information thus filed becomes public information. A penalty is provided for violation of the legislative provisions.

Act 13 of the Second Extraordinary Session of the Sixty-first General Assembly of the State of Arkansas, *Ark. Stat.* 84-4012-15, provides, in substance, that if the Attorney General of the State of Arkansas should have reason to believe that any organization within the State has evaded, attempted to evade, or has defrauded the

State of Arkansas of taxes due it under the laws of the State of Arkansas, he may, upon procurement of an order of authorization *ex parte* from any Chancery Court, scrutinize and obtain copies of the records of the organization and obtain any evidence from the organization revealing evasion of the state taxes or violation of any of the laws of the State of Arkansas. The legislation requires the involved organization to make available to the Attorney General the involved records; a penalty is provided for violation; and the procured evidence becomes admissible in all courts.

Concerning Act 12, as amended, and Act 13, our United States Supreme Court, during the month of October, 1928, *State of New York, ex rel* v. *Zimmerman, et al.* 278 U. S. 63, held similar New York legislation to be Constitutional. The New York Statute—supposedly directed at the Ku Klux Klan—provided that organizations which required an oath prerequisite of membership, other than Labor Unions and Benevolent Orders, file with the Secretary of State of New York a sworn copy of its Constitution, rules, roster of members, officers, etc.

Our 1928 United States Supreme Court, in this *New York* v. *Zimmerman case,* held that the contention of being deprived of liberty of membership in the organization was without merit; that liberty, and other personal rights, must yield to the rightful exertion of police power; that the state might prescribe and apply to organizations any reasonable regulation calculated to define the purposes and activities within limits consistent with the rights of others and the public welfare; that the state was entitled to be informed of the nature and purpose of the organization, the membership, and by whom its activities were conducted; that the required information would operate as an effective or substantial deterrent from violations of public and private right to which the organization might be tempted if such disclosure were not required; that the requirement was not arbitrary or oppressive, but reasonable and likely to be of real effect; and that the power to require the dis-

closures included authority to prevent individual members of an association who had failed to comply from attending meetings or retaining membership with knowledge of its default. Our United States Supreme Court, in that instance, concluded that the "due process clause" of our Constitution was not violated.

However, on the 30th day of June, 1958, our United States Supreme Court did a complete about-face, turned a flip-flop, and, in the case of *NAACP* v. *Alabama,* 357 U. S. 499, ruled that a requirement for disclosure of NAACP membership was Unconstitutional.

Our 1958 United States Supreme Court purported to distinguish the Alabama case from the New York case by taking judicial knowledge that the Ku Klux Klan was engaged in unlawful intimidation and violence, but that, in effect, the NAACP could do no wrong.

Our United States Supreme Court has often stated that where individual freedom ends and state power begins is a delicate decision, and that a restraint upon individual liberties must be justified by clear public interest, *U. S.* v. *Carolene Production Company,* 304 U. S. 144, and *Thomas* v. *Collins,* 323 U. S. 516. There is certainly clear public interest in our schools and in our taxation. Our United States Supreme Court permits every individual freedom, guaranteed by our Constitution, except those afforded the NAACP, to be regulated and subjected to discipline and control. Yes, our United States Supreme Court permits chambers of commerce, labor unions, benevolent orders, charity organizations, and all other such organizations, even our churches, to be subjected to regulations, control and discipline—all except the NAACP.

We know that the Ku Klux Klan was originally formulated to provide unity strength with which to combat carpet bag rule and return our government to the local people. Even so, the Ku Klux Klan was misused and the true purpose of the organization was abused to the detriment of the people, resulting in disorder, breach of peace, violence and other unlawful activities.

Business people provide unity strength with such organizations as chambers of commerce; laboring people achieve unity strength through labor union; and the Negro people have achieved unity strength through the NAACP organization formulated to better the Negro race. Even so, often the true purposes of the chambers of commerce, labor unions, benevolent orders, charity organizations, churches, and even the NAACP are abused. We know that the NAACP has in some instances engaged in stirring up strife, creating resentment and hatred, and has violated laws for the purpose of supplying the United States Supreme Court with fodder for litigation. I am not a Ku Klux Klan sympathizer, and I do not disapprove of the original true purposes of the NAACP, but I do not believe in allowing the rights of the NAACP to exceed the rights of other such organizations. I am of the considered opinion that the individual freedom of NAACP members should be subjected to the same rules and regulations as members of other worthy organizations, including church members.

The majority of this court recites statements of the trial judge that Act 12 is too broad in its scope to meet Constitutional requirements; that the Act precludes organizations from questioning the state's power or duty in the operation of its public schools; and that the Act requires the identity of members of the organization who care to question the power or duty of the state in the aforementioned respect. I shall admit that our present United States Supreme Court will, no doubt, declare any legislation Unconstitutional which purports to regulate or restrict the NAACP and its members as other organizations and their members are regulated and restricted. Prior to the United States Supreme Court assuming the role of guardian for the NAACP—right or wrong—Act 12 was Constitutional; and I don't believe that our State Supreme Court should throw in the towel merely because we know that the United States Supreme Court will declare the legislation Unconstitutional.

I can find no verbiage in Act 12 precluding any organization from questioning the state's power or duty

in the operation of the public schools. For the identity of members of the organizations questioning the state's power or duty to be made known was consistently approved by the courts until the United States Supreme Court recently assumed the obligation of favoring the NAACP and its members with greater privileges than any other organization in this county. I can find no verbiage in Act 12, as amended, denying the right of any citizen to free and untrammeled access to the courts, or discouraging the exercise of that right, as concluded by the trial judge. I can not reconcile the conclusion of the trial judge that Act 12, as amended, constitutes legislative delegation of authority to the county judges, contrary to Article 4, Section 1, of the Arkansas Constitution. Our legislature has many times delegated investigative and judicial authority to county judges, and our Supreme Court has ruled such legislation Constitutional. It will be noted that the trial judge in this instance ruled Act 13 to be Constitutional while ruling Act 12, as amended, to be Unconstitutional, even though Act 13 delegates similar investigative, enforcement and judicial authority to the Attorney General as Act 12, as amended, delegates to the County Judge. The County Judge, by virtue of the provisions of Act 12, as amended, is authorized to make a judicial determination, after notice and hearing, as to whether an organization is engaged in activities detrimental to the powers and duties of the state of Arkansas to control and operate its public schools. The Attorney General, by virtue of the provisions of Act 13, is authorized to investigate any organization, and, upon procurement of an *ex parte* order from any Chancery Court, scrutinize the records and activities of the organization, determine whether the organization is evading state taxes or violating laws of the state, and make the evidence obtained available to the courts.

Most legislation delegates enforcement authority, and I respectfully state that there is no way to justify holding Act 13 Constitutional while, at the same time, holding Act 12, as amended, Unconstitutional. Either would be declared Constitutional except for the recent role of the United States Supreme Court in champion-

ing the NAACP. The provisions of Act 12, as amended, do not afford discrimination as indicated by the trial judge—the legislation applies to all organizations and all persons without favor or exception. All of us know that were the NAACP excluded from the provisions of Act 12, as amended, and Act 13, the United States Supreme Court would find no difficulty in finding the legislation Constitutional. There just must not be any legislation which will in any wise regulate the NAACP if the present United States Supreme Court can be expected to find same Constitutional.

Act 14 of the Second Extraordinary Session of the Sixty-first General Assembly of the State of Arkansas, Ark. Stat. 41-703-6, prohibits any person who has no direct interest from engaging in, exciting and stirring up suits and quarrels between individuals, between an individual and the state, or between an individual and any legal entity; prohibits any person committing a breach of the peace for the purpose of creating litigation; prohibits proposing that another person institute and prosecute a suit against another person, the state, the nation, or any other legal entity; prohibits encouraging, aiding and abetting commission of breach of the peace for litigation purposes; prohibits financing litigation in which the financier has no interest; and prohibits the institution, prosecution, or maintenance of litigation by a person who has no direct or substantial interest in the relief sought.

Act 16 of the Second Extraordinary Session of the Sixty-first General Assembly of the State of Arkansas, Ark. Stat. 41-707-13, prohibits solicitation or donation of finances, and prohibits receiving or accepting financial assistance for the purpose of encouraging or maintaining litigation. The Act does not prohibit regular employment of an attorney upon a fixed fee or contingent basis. The Act provides that a party-litigant, the court or agency in which the proceeding is pending, may require a party-litigant to execute and file with the court an affidavit that he has not received or conspired to receive assistance as an inducement to prosecute or maintain the action. The Act also provides that a party-litigant, the

court, or agency in which the proceeding is pending, may require an involved attorney to execute and file with the court an affidavit to the effect that he is not receiving and will not receive a fee for his services in an action from a source other than his client. The act provides penalties for violation of the Act.

Act 16 provides that no person shall be exempt from attending, testifying, or producing evidence before a Grand Jury, before any court, or in any cause based upon or growing out of an alleged violation of the Act; but that such person shall not be prosecuted or subjected to any penalty concerning any matter about which he is required to testify, produce evidence, or the like. The Act exempts attorneys who are parties to contingent fee contracts with their clients, and wherein the involved litigation concerns title to property, tax matters, common carrier rates, public utilities, criminal prosecutions, and wherein the involved attorney is participating through finances of legal aid societies. The Act prohibits and punishes champerty, maintenance, and barratry, and precludes the solicitation of or stirring up of litigation by those who are not real parties in interest to the subject matter of the litigation.

Barratry, maintenance, and champerty have been prohibited by common law and state statutes for many years; and the evils of barratry, maintenance, and champerty have been condemned by our courts over the years, and also condemned by Canons Rules of Professional Ethics governing attorneys, litigants, and litigation. There is no justification for excluding the NAACP, its attorneys and litigants from barratry, maintenance, and champerty.

Permission to practice law, for instance, is a wonderful privilege, affording a great range of power. A person privileged to practice law holds within his palm the destiny of lives, liberties, and an untold amount of property of others. Attorney activities should be closely regulated. The United States Supreme Court does not question such statements concerning any other than the NAACP.

In the recent case of *NAACP* v. *Button,* 371 U. S. 415, seven of the plaintiffs in the Virginia Public School suits testified that they were unaware of their status as plaintiffs, and ignorant of the nature and purpose of the suits to which they were parties. They did not even know their attorneys; and, of course, the NAACP attorneys did not know them. Even though the NAACP was openly practicing barratry, maintenance, and champerty with ignorant people, the United States Supreme Court condoned such actions.

All attorneys have been taught, and most are firm believers, that his services should not be controlled or exploited by any agency, personal or corporate, which interferes or intervenes between client and lawyer; that a lawyer's qualifications and responsibilities are individual; that a lawyer should avoid all relations which direct the performance of his duties by or in the interest of such intermediary; that his relationship to his client should be personal and that his responsibility should be directly to his client—not through a litigation peddler or canvasser. Solicitation of legal business by the NAACP violates Chapter 33 of Canons Rules of Professional Ethics. In order to permit the NAACP to indulge in barratry, maintenance, and champerty—a privilege not afforded any other organization — the United States Supreme Court in the Button case ruled Virginia legislation prohibiting such practice as Unconstitutional.

No this legislation does not curtail access to our courts. It affords justifiable restrictions to the evil practice of barratry, maintenance, and champerty—nothing more. The NAACP just does not desire such restrictions.

Precluding a person without true interest from engaging in stirring up litigation, precluding commission of breach of the peace for the purpose of creating litigation, and precluding a financier from engaging in litigation in which he has no interest, does not impair freedom of thought and action relating to access of the judiciary. I can see no wrong in the court having

benefit of the true litigants. In fact, the court is entitled to know the true parties to the litigation.

There is no reason why our legislation should preclude unincorporated organizations, such as labor unions, NAACP, and others, from participating in litigation in the names of the involved organizations, and thereby afford the courts knowledge of the true party litigants.

All attorneys should be strenuously regulated for the reasons aforementioned, and for attorneys to be required to abide by professional ethics, court rules and regulations, should not constitute a hazardous operation. Surely, members of the medical profession should not be allowed to run rampant without regulation while they are engaged in activities that control the destiny of people's lives; and, for them to be so regulated as they are, does not place them in a hazardous profession. The legislation does not preclude assistance to indigent people in need of representation in litigation. In fact, the legislation permits legal aid societies to assist such litigants.

The legislation does not impair the power or right to employ an attorney. The legislation merely prohibits people without an interest from financing litigation. While the legislation requires the organization's officers and members to testify concerning the records and activities of the organization, such testimony can not incriminate the witnesses for the simple reason that the legislation provides that no such person shall be prosecuted or subjected to any penalty concerning any matter about which he is required to testify.

Actually, the evidence introduced in the trial court in support of contentions of the NAACP that this legislation will violate the Constitutional guaranties of the NAACP and its members is based purely upon speculation and conjecture. The involved legislation has not been enforced; and, therefore, no one knows whether there would be violations of the Constitutional guaranties of the NAACP. Even so, we might as well face the issue head-on and ignore the possibility that there is no justiciable issue, because we realize that the United

States Supreme Court will take judicial knowledge, regardless of the evidence, that the legislation is Unconstitutional.

The majority of this Court states, in effect, that because the Supreme Court of Virginia has acceded to the wishes of the United States Supreme Court and declared some of the involved legislation Unconstitutional, and that, because the majority of this court is of the considered opinion that the involved legislation will be declared Unconstitutional by the United States Supreme Court, the Arkansas Supreme Court may as well concede. This line of reasoning is as logical as advising the freedom loving people of Cuba that they may as well join the Communist Party because Castro is going to rule anyway. There is a possibility that our United States Supreme Court will in time return to sound judicial activities, render decisions based upon law and evidence, desist from legislation by judicial ediction, and treat the NAACP as all other such organizations are treated. That will not be possible if we voluntarily join the United States Supreme Court during its present recklessness. I do not believe that we should surrender and, thereby, accelerate the reckless disregard of our present United States Supreme Court for our fundamental democratic principles.

This being my first participation as Justice of an appellate court, I sincerely regret that I can not join in the majority opinion of this court. While I fully appreciate the position of the majority of this court, I must respectfully dissent to the majority opinion. No doubt the majority is influenced by the fact that they have been slapped in the face by recent decisions of the United States Supreme Court to such an extent as to cause them to yield to the United States Supreme Court without further ado. I just cannot condone that philosophy. I realize that the United States Supreme Court will declare the involved legislation Unconstitutional, but I do not believe that we should assist.

Therefore, I respectfully dissent.

JIM JOHNSON, Associate Justice (dissenting). I do not agree with the majority opinion. On the merits I would concur with the conclusions reached in the dissenting opinion of Mr. Justice BOYD TACKETT. However, in my view it was error to reach the merits since there is absolutely no justiciable issue presented so as to invoke the applicability of Act 274 of 1953 [Ark. Stat. Ann. § 34-2501 (Repl. 1962) *et seq.*] popularly known as the Arkansas Declaratory Judgment Act. I reach this conclusion notwithstanding the magnanimity of the three-Judge Federal Court's [Western Division of the Eastern District of Arkansas] deference to this court in its opinion of October 8, 1959.

On February 5, 1960 appellees filed suit in Pulaski Chancery Court against the Attorney General and certain Pulaski County officials praying for a declaratory judgment declaring Acts 12, 13, 14 and 16 of the Second Extra-ordinary Session of the Sixty-first (1958) General Assembly [codified, respectively, as Ark. Stat. Ann. §§ 80-1910, 84-4012 (Repl. 1960), §§ 41-703, 41-707 (Supp. 1961)] unconstitutional and further praying that appellants be enjoined from attempting to enforce the statutes. After trial of the issues presented the Chancellor, on May 15, 1961, rendered a Memorandum Opinion holding Acts 12, 14 and 16 unconstitutional and Act 13 valid. This appeal and appellees' cross-appeal are the result of that ruling.

For reversal appellants strenuously urge that the trial court erred by granting a declaratory judgment. It is contended that proceedings for a declaratory judgment, are only appropriate where there is a justiciable determinable controversy. Our rule relative to the contention is set forth in the recent case of *Andres* v. *First Arkansas Development Finance Corp.*, 230 Ark. 594, 324 S. W. 2d 97, as follows:

"Our declaratory judgment act . . . was not intended to allow any question to be presented by any person: the matters must be justiciable. In Anderson on 'Declara-

tory Judgments' 2d Ed. § 187, the general rule is stated as to declaratory judgments:

"Since purpose of the declaratory relief is to liquidate uncertainties and interpretations which might result in future litigation it may be maintained when these purposes may be subserved. The requisite precedent facts or conditions, which the courts generally hold must exist in order that declaratory relief may be obtained may be summarized as follows: (1) There must exist a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy; in other words, a legally protectable interest; and (4) the issue involved in the controversy must be ripe for judicial determination."

In the same authority in § 221 at page 488 the rule is stated:

"The Declaratory Judgment Statute is applicable only where there is a present actual controversy, and all interested persons are made parties, and only where justiciable issues are presented. It does not undertake to decide the legal effect of laws upon a state of facts which is future, contingent or uncertain. A declaratory judgment will not be granted unless the danger or dilemma of the plaintiff is present, not contingent on the happening of hypothetical future events; the prejudice to his position must be actual and genuine and not merely possible, speculative, contingent, or remote."

This logical limitation adopted by our court generally prevails elsewhere. See 26 C. J. S., Declaratory Judgments § 24 *et seq.*

In the face of this rule the burden was on appellees to prove that there was a justiciable issue and hence a fit subject for declaratory judgment relief. See Am. Jur. Declaratory Judgments, §§ 69-70, Evidence and Trial Issues of Fact. See also 10 R. C. L., p. 897.

It is undisputed that no attempt has been made to apply the acts here complained of against appellees yet appellees contend that the mere fact that Acts 12, 13, 14 and 16 are on the books have adversely affected them in that there had been a loss of memberships and contributions. The principal witness for appellees, through whom it sought to prove appellees' assertions, was Clarence A. Laws of New Orleans, Louisiana, Field Secretary for the National Association for the Advancement of Colored People. Laws testified to the effect that the Arkansas memberships in his association had been declining since 1956. However, the record shows that the membership increased somewhat in the year 1958, the same years those acts were passed. In fact, the entire context of Laws' testimony, as well as the testimony of appellees' other witnesses, upon whom they relied to prove a justiciable issue, shows beyond question that it is entirely speculative as to what caused the drop in membership and the alleged loss of contributions. Therefore, from the record before us, it is impossible for me to conclude that appellees sustained the burden of proving that a justiciable issue existed. The majority opinion to the contrary effectively opens the gate for every special interest group in Arkansas to demand the entire time of the courts of this state in passing upon all statutes which might, in their wildest imagination, affect their special interest. This, of course, is clearly contrary to the intent of the Declaratory Judgment Act and such an abuse as exists in the case at bar should not bear the stamp of approval of this court.

For the reason stated, I would reverse and dismiss.