706 F.2d 778
 11 Ed. Law Rep. 141
 Michael GORDON, Gerald Eggen, William Hays, Martha Drury,
Pete Kelly, Lisa Churilla, Nancy McLean, Mitchell
Koneczny, Lisa Hanson, Michael LaFrance
and Karen Priemer, Plaintiffs-Appellants,
v.
WARREN CONSOLIDATED BOARD OF EDUCATION, Arthur Woodhouse,
Superintendent, Jerry Montecillo, Deputy
Superintendent, Yvonne GuGel, Assistant
Principal, jointly and
severally,
Defendants-
Appellees.
 No. 81-1173.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 7, 1982.
Decided May 20, 1983.
 
 Richard A. Soble, Goodman, Eden, Millender, Bedrosian, Detroit, Mich., Robert Koory (argued), Connie Schweifler, Detroit, Mich., for plaintiffs-appellants.
 Richard U. Mosher (argued), Mosher & Vondale, Bloomfield Hills, Mich., for defendants-appellees.
 Before ENGEL and KEITH, Circuit Judges and GIBSON,* Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 On May 10, 1979, Plaintiff-appellants filed the present action against Warren Michigan public school officials in the United States District Court for the Eastern District of Michigan. Plaintiffs are certain teachers, students and parents of students who attended Cousino High School. During the 1977-78 school year, school officials sought and helped place an undercover policewoman in two classes at Cousino High School. The articulated purpose of the covert operation was to reduce drug trafficking in the school. Plaintiffs, however, contend that impermissible political considerations motivated the placement of the undercover agent. The presence of the undercover policewoman in the classrooms allegedly infringed plaintiffs' First Amendment rights. The subsequent discovery of the covert operations stifled the "open" discussions which had characterized the classrooms, interfered with academic freedom, and stigmatized the teachers and students. On February 3, 1981, the United States Court for the Eastern District of Michigan dismissed the complaint for failure to state a cause of action. We affirm.
 
 I.
 
 2
 On December 2, 1977, the Deputy Superintendent of Warren Consolidated Schools met with members of the Warren Police Department. It was agreed, at the request of the Deputy Superintendent, that a policewoman would enroll at Cousino High School and act as an undercover agent. The purported purpose of the undercover operation was to investigate the involvement of teachers and students in drug trafficking at Cousino High School. The Superintendent of Warren Consolidated Schools approved the project a short time later.
 
 
 3
 On December 12, 1977, the policewoman enrolled in Cousino High School posing as a transfer student. An assistant principal at the school learned the true identity of the undercover policewoman, but processed the false transcripts which the Deputy Superintendent had prepared.
 
 
 4
 The policewoman was placed in only two classes, a sociology class and a psychology class. Each of the teachers had "liberal reputations" and were known to run "open" classrooms. The undercover agent confirmed that she was stationed in those particular classrooms because they contained "liberal students and teachers."
 
 
 5
 The policewoman apparently performed admirably in her role as an undercover agent. She did not, however, discover any evidence of drug sales occurring in the classrooms where she was stationed. In fact, she uncovered no drug sales occurring at the high school. On January 19, 1978, the policewoman requested that the covert operation terminate. On the date the request was made, the undercover agent still had not uncovered a single drug transaction. The operation, however did not terminate immediately. Covert surveillance of the classrooms continued until the end of February.
 
 
 6
 At the conclusion of the two and one-half month covert surveillance operation only one drug "sale" had occurred. The sale occurred at a student's home, not at the school. The purchase involved a single ounce of marijuana.
 
 
 7
 On March 2, 1978, certain high school students learned the undercover policewoman's true identity when she appeared at an arraignment. On April 6, 1978, plaintiff teachers learned that a drug surveillance operation had been conducted in their classrooms. When questioned, the assistant principal informed the plaintiff teachers that the Deputy Superintendent knew the details of the covert operation. That same day, the Deputy Superintendent admitted to plaintiff teachers that an undercover agent had been placed in their rooms. During the meeting, the Deputy Superintendent allegedly stated that if he felt it was necessary, he would have another undercover police operation conducted in the school.
 
 
 8
 News that the sociology and psychology classes at Cousino High School were the target of a covert drug trafficking investigation spread throughout the school and community. Community newspapers reported the event. Disclosure of the investigation allegedly dramatically altered the content and open discussion methodology which had characterized the psychology and sociology classes. Class discussions became stilled, and certain topics were avoided, and students refused to freely express their opinions.
 
 
 9
 On May 10, 1979 certain teachers, students, and parents of students who attended Cousino High School[1] filed the present action alleging the Warren Consolidated Board of Education, Assistant Principal of Cousino High School, and the Superintendent and Deputy Superintendent of Warren Consolidated Schools violated their rights under 42 U.S.C. Sec. 1983 and the First and Fourteenth Amendments. Allegedly, the plaintiff teachers political beliefs motivated school officials to place the undercover policewoman in the sociology and psychology classes during the 1977-78 school year. This covert police surveillance and its threatened use in the future allegedly injured the plaintiff sociology and psychology teachers by: 1) violating their right to academic freedom; 2) precipitating a change in their teaching methods; 3) altering the content of teaching materials; 4) interfering with their right of free association; 5) destroying the teacher-student relationship; and 6) damaging their professional reputations and future employment opportunities. Plaintiff students were also damaged by the covert surveillance. The surveillance chilled their speech, interfered with their education, inhibited the pursuit of their daily lives and relationships.
 
 
 10
 On August 6, 1979, plaintiff teachers filed an amended complaint which alleged that defamatory statements were republished in the presence of students and teachers in retaliation for the maintenance of this lawsuit. The superintendent allegedly maliciously republished letters which indicated that plaintiff teachers were inculcating students with values of unfairness, dishonesty, injustice and untruth. The letters allegedly portrayed plaintiff teachers as "thiefs" or "wholesale robbers of the system".
 
 
 11
 On February 3, 1981, the district court dismissed the complaint for failure to state a cause of action. The court ruled that the complaint alleged no more than a subjective chilling of First Amendment rights. See Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-2326, 33 L.Ed.2d 154 (1972). Moreover, the mere possibility of improper use of information gained from police surveillance of unlawful activities is not itself actionable. See Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate, 519 F.2d 1335, 1337 (3d Cir.1975). We agree.
 
 II.
 
 12
 School officials contend that this action is nonjusticiable because plaintiffs merely suffered a "subjective chilling" of their First Amendment rights when the covert police surveillance operation at Cousino High School became public knowledge. School officials rely primarily upon Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) to support their contentions. We agree that Laird is controlling.
 
 
 13
 In Laird the complaint alleged that the United States Armed Forces intelligence agencies had engaged in the surveillance of lawful and peaceful civilian activity, collected information on political protests which served no legitimate military purpose, and disseminated this information to various military headquarters in the United States. These activities allegedly curtailed plaintiff's First Amendment rights and deprived them of their constitutionally guaranteed right of privacy. The Supreme Court rejected the claims that the intelligence activities had a "chilling effect" upon the exercise of First Amendment rights because plaintiffs were unable to point to any resulting direct injury or immediate threat of harm. The mere existence of a military data-gathering system does not constitute a justiciable controversy. "Allegations of subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the constitution do not render advisory opinions." Laird, 408 U.S. at 13-14, 92 S.Ct. at 2325-2326.
 
 
 14
 In the present case there is not a single allegation that the covert operation in and of itself resulted in tangible consequences. The surveillance did not disrupt classroom activities or the education of students. The mere presence of an intelligence data-gathering activity in the classroom does not create a justiciable controversy. See Laird, 408 U.S. at 13-14, 92 S.Ct. at 2325-2326. The vague general allegations that students and teachers were harmed when news of the covert operation spread through the community simply do not meet the "causation" component of Laird. These allegations only constitute a "subjective" chilling of the First Amendment rights.[2]
 
 
 15
 Furthermore, it should be noted that the undercover investigation here was apparently prompted by the school officials' wholly legitimate concern about the possible illegal drug activity at Cousino High School. Plaintiffs do not allege that the undercover agent engaged in any conduct other than the investigation of illegal drug activity. Moreover, the investigation terminated shortly after the undercover officer failed to discover any evidence of drug trafficking at the school. Finally, even accepting plaintiff's assertion that the investigation focused on classes where students and teachers held "liberal" socio-political views, there is no indication that the investigation had any tangible and concrete inhibitory effect on the expression of particular socio-political views in these classrooms.[3] Plaintiff's subjective fear that the content of class discussions could be reported to school administrators or others is insufficient to establish a First Amendment claim. Compare Socialist Workers Party v. Attorney General, 419 U.S. 1314, 1319, 95 S.Ct. 425, 428, 42 L.Ed.2d 627 (1974) (J. Marshall) (In Chambers opinion).
 
 
 16
 Accordingly, the judgment entered by United States District Court Judge James Harvey is affirmed. Judge Harvey's analysis of the First Amendment claims in the instant case was thorough and complete.
 
 
 
 *
 Hon. Floyd R. Gibson, Senior Circuit Judge, U.S. Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 Plaintiffs in this action are Michael Gordon, Gerald Eggen, William Hays, Martha Drury, Pete Kelly, Lisa Churilla, Nancy McLan, Mitchell Koneczny, Lisa Hanson, Michael LaFrance, and Karen Priemer. Michael Gordon and Gerald Eggen taught the psychology and sociology classes where the undercover agent was stationed
 
 
 [2]
 The present case is readily distinguishable from Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate, 519 F.2d 1335 (3d Cir.1975) and Paton v. LaPrade, 524 F.2d 862 (3d Cir.1975). In Tate, the Philadelphia Police Department publicly disclosed the contents of certain police intelligence files on network television. Several protest groups and certain named individuals identified in the broadcast alleged the disclosure harmed them in various specific ways. The Tate court found that such a public disclosure created a justiciable cause of action. 519 F.2d at 138-39. In Paton the Third Circuit ruled that a justiciable controversy was present where the FBI investigated a single high school student. 524 F.2d 862
 
 
 [3]
 We find no support for plaintiff's suggestion that an undercover investigation is necessarily constitutionally infirm because the focus of that investigation was directed to classes where particular socio-political views were espoused. Courts have recognized that physical surveillance consistent with Fourth Amendment protections in connection with a good faith law enforcement investigation does not violate First Amendment rights, even though it may be directed at communicative or associative activities. See Reporters Committee for Freedom of the Press v. American Telephone and Telegraph Company, 593 F.2d 1030, 1058 (D.C.Cir.1978), cert. denied, 440 U.S. 949, 99 S.Ct. 1413, 59 L.Ed.2d 639 (1979) (government inspection of journalists' toll-call records which might disclose identity of secret sources); United States v. Oaks, 527 F.2d 937, 941 (9th Cir.1975), cert. denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976) (surveillance by undercover agent of public meeting of tax rebellion group); Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate, 519 F.2d 1335 (3d Cir.1975) (No justiciable chilling effect where surveillance activities limited to public meetings.) Here there is no suggestion that the investigation of drug activities was conducted in bad faith and was surreptitiously designed to regulate or proscribe the content of discussion in the classroom. Furthermore, plaintiffs do not contend that the investigation invaded any legitimate expectation of privacy so as to invoke Fourth Amendment protections. Finally, it should also be noted that this case is distinguishable from those cases where an investigation significantly invades rights of associational privacy and is not germane to the detection of specific criminal conduct. See Gibson v. Florida Legislative Comm., 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1962); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)