CARTER v. CAIN.

Opinion delivered February 25, 1929.

*Ross Mathis, W. J. Dungan* and *J. F. Summers,* for appellant.

*Roy D. Campbell,* for appellee.

MEHAFFY, J.   The appellants, who are taxpayers and residents of Woodruff County, began this suit in the chancery court against W. R. Cain, county judge, R. B. Keating, W. W. Rainey, Neudy Arnof, A. C. McGregor and Bill Rives, alleging that Cain was county judge and McGregor was the county judge-elect, and would assume the duties on January 1, 1929; that Bill Rives was the county clerk, and Keating, Rainey and Arnof were appointed commissioners and directed to prepare plans and let contract for the erection of a courthouse and jail at McCrory, Arkansas; that on November 30, 1928, said commissioners reported to the court that they had procured a lot and had prepared plans and specifications for a suitable courthouse and jail at McCrory, which plans were approved by the court, and said commissioners were directed to advertise for bids and let contract for the

erection of a courthouse and jail; that the commissioners had employed an architect to draw plans, and were proceeding to receive bids and let the contract; that, if not enjoined, they would let the contract and incur further expenses.

Appellants alleged that the authorization of the contract amounted to an illegal exaction from the taxpayers of the county, and that the appropriation for the erection of said courthouse and jail and all the proceedings were void, for the reason that the appropriation of $5,000 per annum exceeded the revenue available from all sources after the payment of the necessary governmental expenses of the county, and that it was in violation of Amendment No. 11 of the Constitution of the State of Arkansas.

The complaint then shows the revenue and expenditures and probable revenue for the future and necessary expenses for the future, and alleges that they have no adequate remedy at law, and prays for an injunction preventing the issuing of any warrants or the payment of any claims, and to prevent the letting of the contract or the incurring any other expenses.

Constitutional Amendment No. 11 has been before this court several times, but Amendment No. 17, also involved here, was adopted by the people at the general election November 6, 1928, and has never been before this court for interpretation or construction. Amendment No. 17 reads as follows:

"Section 1. The power and right is hereby vested in the qualified electors of each respective county in this State, by a majority of said electors voting on the question, to authorize the construction, reconstruction or extension of any county courthouse or county jail, and to authorize the levy of a tax not to exceed one-half of one per cent. on the dollar of the valuation of all properties in such county subject to taxation, to defray the cost and expenses thereof or to take up any indebtedness existing

at the time of the adoption hereof, incurred in building, constructing or extending any county courthouse or jail.

"Section 2. The county court of any county may, by proper order, duly entered of record, determine whether or not the necessity for any such construction, reconstruction, or extension exists, and, when such necessity is found to exist, said county court shall cause to be made and prepared such plans, specifications or estimates of cost of such contemplated improvements as may be proper for a reasonable understanding of the nature, extent and approximate cost thereof, and may employ an architect for said purpose, which said plans, specifications and estimates shall be filed in the office of the county clerk of such county, and remain and be held subject to the inspection of any and all persons interested.

"Section 3. Any and all such plans, specifications and estimates may, when considered, be rejected by the county court, and new ones, or alterations of the original ones, ordered to be made, and when such preliminary set of such plans, specifications and estimates is filed and shall meet the approval of said county court, an order approving the same shall be entered of record, and the court shall order and direct the question of the construction of such building or extension be submitted to the qualified electors of such county in the next general election held thereafter; provided, however, that if no general election for county and State officers will, under the law, be held within one year of the making of the said order, then the county court may, by order of record, call a special election in such county, to be held not less than 30 days nor more than 60 days thereafter; and shall name the date therefor. Such special election shall in all other respects be held as is now or hereafter may be provided by law for the holding and conducting of general elections, and it shall be and it is hereby made the duty of the sheriff of such county, by a proclamation duly made and published for the time and as provided by law, to give notice of the proper time and place of holding such election."

Section 4 provides the manner of holding the election and the duty of the election officers, and further provides that, if a majority votes for the improvement, the county court shall make an order showing the total vote for and total vote against such. It also provides that more than one building or improvement may be embodied in the proceedings, but each must be described so as to indicate to the electors what he is voting on, and there must appear on the ballot "For construction" and "Against construction;" and also appear on the ballot "For building tax," and "Against building tax."

Section 5 provides that, if a majority vote for the building and the tax, then the levying court may levy, in addition to all other taxes now authorized by law, a special building tax, not to exceed one-half of one per cent. on the dollar of the assessed valuation of the property, to pay for such improvements, or to provide a sinking fund for such purpose. This section also provides that, when the levy is once made, it shall continue in force from year to year and be extended on the taxbooks and collected until sufficient funds are collected to pay the cost of the improvement, or any bonds, notes, or interest thereon.

Section 6 provides that, when the tax has been voted and the amount levied, the county court may issue and sell interest-bearing negotiable bonds or notes, bearing interest not to exceed five per cent., to mature at such times as may be determined by the court or judge, and sell the same in such manner and upon such condition as the court may by order deem proper for the purpose of raising funds, etc. It also provides that the bonds shall not be sold for less than par or face value, and they are to be secured by the special tax levied for the purpose. After this is done, the amendment, in § 7, provides that the county court or the judge thereof shall proceed with the construction of such improvement.

It will be observed that the amendment was adopted on November 6, 1928, and the proceedings had by the

county court and commissioners for the purpose of building a courthouse and jail were all had at a later date. That is, after the amendment was in effect.

There is no dispute about the amendment being in effect at the time the proceedings began, but the appellee contends that, when the building of a courthouse or jail is under consideration, the county court may adopt either one of two methods. It is insisted that, if the revenues of the county will permit, the court can order the improvement made by making appropriations and spreading same over a period of years; but that, if the revenues of the county will not justify this procedure, then an election may be called for the purpose of voting on the improvement and tax. In other words, it is insisted that, since the adoption of Amendment No. 17, a county has two distinct and unrelated methods of building a courthouse; one plan with additional taxes, the other without additional taxes. And it is insisted that there is nothing in Amendment No. 17 that repeals any powers conferred upon a county court or the quorum court by the Constitution before the adoption of this amendment.

The rule by which amendments to the Constitution are to be construed was stated by this court in *Hodges* v. *Dawdy,* 104 Ark. 583, 149 S. W. 656. The court said in that case, in construing the constitutional amendment known as the initiative and referendum:

"The amendment being the last expression of the popular will in shaping the organic laws of the State, all provisions of the Constitution which are necessarily repugnant thereto must, of course, yield, and all others remain in force. It is simply fitted into the existing Constitution, the same as any other amendment, displacing only such provisions as are found to be inconsistent with it. Like any other new enactment, it is a 'fresh drop added to the yielding mass of the prior law, to be mingled by interpretation with it.' In the construction of its terms, and in the determination of

its scope and effect, the court should follow the settled rules of interpretation.''.

The court in the above case also said: ''The rules of construction applicable to statutes ordinarily apply with equal force to constitutions or amendments thereof, though some courts hold to even more restricted rules in the construction of provisions of the organic law.''

A cardinal rule in dealing with written instruments is that they are to receive an unvarying interpretation, and that their practical construction is to be uniform. A, Constitution is not to be made to mean one thing at one time and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. Cooley's Constitutional Limitations, vol. 1, 124.

It may be that the circumstances in the instant case are such as to make it very much more desirable to erect the courthouse and jail under the old provisions of the Constitution without doing the things required by Amendment No. 17, but constitutions are framed with special reference to the varying moods of public opinion and with a view to putting the fundamentals of government beyond their control. The object of construing a provision of the Constitution is to ascertain the intent and to give effect to the intent of the people in adopting it. The intent is generally to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey the intent of the people, and, unless an examination demonstrates that such language has not been employed, nothing remains to be done except to enforce the provision. In construing an amendment to a Constitution, such amendment must, if possible, be harmonized with all the other provisions of the Constitution. Wherever this cannot be done, however, the amendment must prevail.

The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and of the people who adopt it. The court therefore should constantly keep in mind the ob-

ject sought to be accomplished by its adoption and the evils, if any, sought to be prevented or remedied. 12 C. J. 700.

In ascertaining the intention of the people who adopted the amendment, we may and should look to the history of the times as well as the provisions of the Constitution prior to the adoption of the amendment, ascertain what the mischief was to be remedied, and, in consideration of all these things, arrive at the intention of the people in adopting the amendment.

Some years ago the people adopted what is known as the initiative and referendum amendment. That, among other things, provided that the people of each municipality, each county and the State, reserve to themselves the power to propose laws and amendments to the Constitution, etc. In construing the initiative and referendum amendment, this court said:

"It is evident that the words 'each municipality' and 'each county' were inaptly thrust into the amendment as originally framed in a way that they express nothing and mean nothing, unless they may be treated merely as words of emphasis. * * * The amendment, construing its language as we do, was adopted solely for the purpose of reserving to the people of the State the sovereign power of direct legislation by the process of the initiative and referendum upon the conditions named, and no additional power was conferred separately upon the people of municipalities and counties." *Hodges* v. *Dawdy,* 104 Ark. 583, 149 S. W. 656.

The court in the same case also held that, while the people reserve the right to themselves to initiate constitutional amendments, the old provision of the Constitution limiting the number of amendments that might be submitted by the Legislature to three was still in effect. And, although the people might initiate constitutional amendments, they could not do so if the Legislature had already submitted three. This construction of the Constitution gave it a meaning evidently different from what the people thought it meant, and they therefore initiated

another amendment and adopted it for the purpose of enabling them to submit as many amendments as they wished, and also to provide for local legislation by municipalities and counties. The people then adopted Amendment No. 11, which provides:

"The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made; nor shall any county judge, county clerk or any other county officer sign or issue any scrip, warrant, or make any allowance in excess of the revenue from all sources for the current fiscal year; nor shall any city council, board of aldermen, board of public affairs, or commissioners of any city of the first or second class, or any incorporated town, enter into any contract or make any allowance for any purpose whatsoever, or authorize the issuance of any contract or warrant, scrip or other evidence of indebtedness, in excess of the revenue for such city or town for the current fiscal year; nor shall any mayor, city clerk or recorder, or any other officer or officers, however designated, of any city of the first or second class or incorporated town, sign or issue any scrip, warrant or other certificate of indebtedness in excess of the revenue from all sources for the current fiscal year."

It is unnecessary to quote other portions of Amendment No. 11. This amendment was adopted, as was said in the case construing it, to enable municipalities and counties to pay their indebtedness and to get on a cash basis, and also to prevent counties, cities and towns from accumulating a floating debt which could not be paid by the total revenues of the fiscal year. *Kirk* v. *High,* 169 Ark. 152, 273 S. W. 389, 41 A. L. R. 782.

The court also held, however, in the above case, that that did not mean that courthouses or jails could not be erected unless the total cost of the construction can be

paid out of the revenues of a single year. In other words, the court held that, while the purpose in adopting the amendment was to prevent counties and towns from going in debt, yet it did not prohibit them from going in debt for building courthouses and jails. They could provide for annual payments, and this was not prohibited by Amendment No. 11.

Since the case above referred to, a number of other cases have been decided by this court involving Amendment No. 11. See *Polk County* v. *Mena Star Co.,* 175 Ark. 76, 298 S. W. 1002, and authorities there cited.

After the court had construed this Amendment No. 11 to mean that a county could go in debt for courthouses and jails, the people then adopted Amendment No. 17, vesting the authority and right to construct courthouses and jails and to levy taxes to pay for them, in the qualified electors of the county. Amendment No. 17 was evidently adopted for the very purpose of meeting the decision of this court and accomplishing what they thought was accomplished by Amendment No. 11, when adopted. That is, to prevent counties from going in debt, and provide a method for building and paying for courthouses and jails. But it is insisted that there are two methods now. We do not agree to this contention. Amendment No. 17 authorizes the county court to determine the necessity of building a courthouse or jail and to have plans and specifications made, and to submit the question to the people. It is insisted that, if the county has money on hand to build the courthouse, or, rather, if they have some money and can pay it out in annual installments, then No. 17 does not apply. If they have no money, then the people may determine whether they shall have a courthouse or jail.

In the first place, the amendment provides for submitting both questions to the electors. They shall vote for the construction or against the construction, and also vote for tax or against tax. In other words, the qualified electors are to determine whether there is to be any improvement made, and also to vote for or against a tax

for the purpose of paying for the improvement. If the county had money with which to build a courthouse or jail, there would of course be no occasion to submit the question to the qualified electors as to whether they would or would not vote a tax. No tax would be necessary. Numbers of courthouses have been built under Amendment No. 11, as construed by this court, and indebtedness has been created for the purpose of paying for these courthouses, and Amendment No. 17 provides for paying that debt by special taxation. It provides for the levy of the tax not only to build the improvement voted for, when improvement is voted for, but it also provides that they may vote for a tax to take up any indebtedness existing at the time of the adoption of the amendment, incurred in building, constructing or extending any courthouse or jail. Again, the people used the word "vested." The first sentence of the amendment is: "The power and right is hereby vested in the qualified electors," etc.

In construing a Constitution or a constitutional amendment, it is the duty of the court to ascertain the meaning, and they must therefore ascertain the natural signification of the words used. And words in a constitutional amendment are to be interpreted and understood in their most natural and obvious meaning. In other words, they are to construe them to mean the same that they mean in the other provisions of the Constitution and their meaning generally when used in constitutions or amendments.

The Constitution of the United States provides that all legislative powers shall be vested in a Congress of the United States; that the executive power shall be "vested" in a President of the United States; that the judicial power shall be "vested" in one Supreme Court, etc.

Our own Constitution provides that the legislative powers shall be "vested" in a General Assembly, and this was amended by reserving the right to the people to initiate or refer measures. Our Constitution also provides that the supreme executive power of this State shall

be ''vested'' in a chief magistrate, and that the judicial power of the State shall be ''vested'' in the Supreme Court, in inferior courts, etc.

We think there is no doubt about the meaning of the word ''vested.'' In each of the cases referred to in the. Constitution it means the entire power, except in the case of the legislative department, where the initiative and referendum amendment reserved certain powers to the people.

Webster defines ''vested'' as follows: ''That has become a complete and consummated right; that has taken effect, as an immediate fixed right to present or future enjoyment.'' That is the sense in which it has been used both in the Constitution of the United States and the Constitution of the State of Arkansas, and the sense that it is used in Amendment No. 17. Moreover, the history of the times and initiation and adoption of amendments, we think, clearly show not only that the people reserve to themselves the right to do these things, but that they intended, in the adoption of Amendment No. 17, to cure the evil that they thought existed because of the construction put on No. 11 by the courts.

If a county court decides that a courthouse or jail is necessary (and this right to decide is in the county court), it may then prepare the plans and specifications and do the things mentioned in Amendment No. 17, and call an election and submit to the qualified electors of the county the questions decided upon. That is, if a county wishes to vote a tax to pay for a courthouse or jail already built, the county court can submit that question to them, and they can then vote for or against tax. If the county court decides that a courthouse or jail should be constructed or reconstructed, that question is submitted to the qualified electors, and they vote for or against the improvement.

If the county had money on hand to build the courthouse, there would probably be no necessity for submitting any question to them except the question as to whether the improvement should be made. If a court-

house is needed, then the qualified electors vote on·the question, and also vote for or against tax. This is now the only method for building courthouses or jails.

The decree of the chancery court is therefore reversed, and remanded with directions to issue the injunction prayed for in the complaint. .