Winston BRYANT, Attorney General *v.* Dr.
Arthur ENGLISH, the Republican Party of
Arkansas, the Democratic Party of Arkansas,
and Martin Borchert *v.* Jim Guy Tucker,
Lieutenant Governor

92-1284                                    843 S.W.2d 308

Supreme Court of Arkansas
Opinion delivered December 4, 1992

188

*Winston Bryant*, Att'y Gen., by: *Royce Griffin*, Chief Deputy Att'y Gen., for appellant.

*Youngdahl, Trotter, McGowan, O'Connor & Farris*, by: *Scott Trotter* and *Kimberly Salors*, for appellee Dr. Arthur English.

*Karr, Hutchinson & Stubblefield*, by: *Asa Hutchinson*, for appellee Republican Party of Arkansas.

*Rose Law Firm*, by: *Vincent Foster, Jr.* and *Webb L. Hubbell*, for appellee Democratic Party of Arkansas.

*Gill, Wallace, Clayton, Flemming, Elrod & Green*, by: *John P. Gill*, for appellee Martin Bochert.

*L. Scott Stafford*, for cross-appellant Jim Guy Tucker.

ROBERT H. DUDLEY, Justice. On November 6, 1990, Governor Bill Clinton was re-elected to the Office of Governor, and Jim Guy Tucker was elected to the Office of Lieutenant Governor. Both were elected and commissioned to four-year terms of office that commenced on January 15, 1991. On November 3, 1992, a little over twenty-one months later, Governor Clinton was elected to the Office of President of the United States of America. It is anticipated that Governor Clinton will resign from the Office of Governor before January 20, 1993, which is the day the oath of the Office of President of the United States will be administered. The result will be that a vacancy will exist in the Office of Governor, and more than twelve months will remain on the four-year term to which Governor Clinton was elected.

This suit for a declaratory judgment was filed requesting an interpretation of the various provisions of the Constitution of Arkansas regarding succession to the Office of Governor when the Governor resigns with more than twelve months remaining in the term of office. The trial court entered a judgment declaring that upon the resignation of Governor Clinton, the powers and duties of the Office of Governor, but not the office itself, will devolve upon the Lieutenant Governor for the remainder of the four-year term. The trial court also ruled that a special election to fill the office is not required and that the Lieutenant Governor is not authorized to appoint a successor to the Office of Governor. Attorney General Winston Bryant appeals from the judgment,

and Lieutenant Governor Jim Guy Tucker cross-appeals from that part of the judgment declaring that the Office of Governor does not devolve upon the Lieutenant Governor. On direct appeal, we affirm the trial court's judgment and hold that upon the resignation of a Governor, the powers and duties of the Office of Governor devolve upon the Lieutenant Governor for the remainder of the four-year term, and, on cross-appeal, we reverse and hold that the Office of Governor itself devolves upon the Lieutenant Governor.

## I. Procedure

The Declaratory Judgments Act, Ark. Code Ann. §§ 16-111-101 — 16-111-111 (1987), provides that the purpose of the act is "to afford relief from uncertainty . . . with respect to . . . status," and the act is to be liberally construed to that end. The parties stipulated in the trial court that they anticipate that Governor Clinton will resign from the Office of Governor, and the trial court held that a justiciable controversy exists. We have concluded that we should decide the issue because it is a matter of significant public interest and a matter of constitutional law. *See Bennett* v. *N.A.A.C.P.*, 236 Ark. 750, 370 S.W.2d 70 (1963).

## II. Background

Neither the 1836 Constitution of Arkansas nor the 1861 constitution provided for the office of Lieutenant Governor. Those constitutions placed the President of the Senate next in the line of succession for the Office of Governor, and they required a special election if the remaining term of the Governor exceeded a certain period of time. The 1864 constitution, for the first time, created the office of Lieutenant Governor and provided for a statewide election to the office. Ark. Const. of 1864, art. VI, § 19. The 1868 constitution also provided for a Lieutenant Governor and stated that if the Office of Governor became vacant, the Lieutenant Governor served during the "residue of the term." It made no provision for a special election to fill the vacancy. Ark. Const. of 1868, art. VI, § 10.

Unfortunately, the present Constitution of Arkansas, adopted in 1874, did not originally provide for the office of Lieutenant Governor. Article 6, sections 12 and 13 of the present constitution, originally placed the President of the Senate,

followed by the Speaker of the House, in the line of gubernatorial succession, but article 6, section 14 required a special election to fill a vacancy in the Office of Governor when the office was vacated more than twelve months before the expiration of the Governor's term. Article 6, section 12 of the present constitution originally provided that in the event of the "death, conviction or impeachment, failure to qualify, resignation, absence from the State or other disability of the Governor," the powers and duties of the office devolved on the President of the Senate "for the remainder of the term, or until the disability be removed, or a Governor elected and qualified." When construed with the special election procedure of article 6, section 14, the reason for each of these three limitations on the President of the Senate's period of service is obvious. Each limitation on service was tied to a different contingency. If the Governor became disabled, the President of the Senate served as Governor until the disability was removed. If the office became vacant through death, impeachment, or resignation of the Governor less than twelve months before the end of the Governor's term, the President of the Senate served "for the remainder of the term." If the vacancy in office occurred more than twelve months before the end of the Governor's term, the President of the Senate served until "a governor [was] elected and qualified" at a special election called in accordance with article 6, section 14.

Only days after his inauguration on January 18, 1907, Governor John Sebastian Little suffered a nervous breakdown. Arkansas History Commission, 1 *Annals of Arkansas 1947* 239 (Dallas T. Herndon ed., 1947) [hereinafter *Annals*]. On February 11, 1907, Governor Little wrote Senator John I. Moore, the President of the Senate, and asked him to assume the duties of Governor. Senator Moore served as acting Governor until the adjournment of the General Assembly on May 14, 1907. *Id.* at 239. He was succeeded as acting Governor by Senator X.O. Pindall, who was elected President of the Senate shortly before its adjournment. Senator Pindall served as chief executive for sixteen months from May 15, 1907, until January 11, 1909, when he was replaced by the newly elected President of the Senate, Jesse M. Martin. *Id* at 240. Senator Martin was acting Governor for three days until the inauguration of George W. Donaghey, who had been elected Governor at the general election of 1908.

*Id.* at 240. In sum, during the two-year period between January 15, 1907, and January 15, 1909, the affairs of Arkansas were in the hands of no less than six governors: Jeff Davis, John Sebastian Little, John I. Moore, X. O. Pindall, Jesse M. Martin, and George Donaghey. *See id.* at 233, 239-41.

The first seven months of 1913 were even more trying; they amounted to a gubernatorial succession crisis. The crisis was triggered when Governor Joe T. Robinson resigned from office following his election to the United States Senate. *Id.* at 247. W. K. Oldham was President of the Senate when Governor Robinson resigned, but because Senator Oldham was prohibited by article 5, section 18 of the constitution from serving past the end of the legislative session, the Senate elected J. M. Futrell as its President prior to adjournment on March 13, 1913. *See id.* at 251. Oldham argued that pursuant to article 6, section 12, he succeeded to the Office of Governor when Governor Robinson resigned and did not cease to be Governor when a new Senate President was elected. Futrell argued that he became Governor by virtue of his election as President of the Senate two days after Governor Robinson's resignation. *In Futrell* v. *Oldham*, 107 Ark. 386, 155 S.W. 502 (1913), this court ruled in Futrell's favor, holding that under article 6, section 12, the powers and duties of Governor devolved upon the office of the President of the Senate and not upon the individual occupying that office. In sum, during the first seven months of 1913, state government was headed by five different individuals: George Donaghey, Joe T. Robinson, W. K. Oldham, J. M. Futrell, and George W. Hays. *See Annals, supra,* at 244, 247, 251. This was labeled our "procession" of governors. Dr. David Y. Thomas, 1 *Arkansas and Its People; A History, 1541-1930* 282 (1930). The newspapers of the time spoke of the confusion. The *Arkansas Democrat* of January 31, 1913, contained an article that began, "Political complications in Arkansas are as thick as a London Fog." The February 8, 1913, *Arkansas Democrat* carried an article that contains the sentence, "Kill off the antiquated method of filling a gubernatorial vacancy."

### III. Amendment 6

In February 1913, Representative Kidder introduced a House Joint Resolution for a constitutional amendment that

would create the office of Lieutenant Governor. In part, it was a replication of the provision in the 1868 constitution. The March 5, 1913, *Arkansas Democrat* wrote: "There is no sound argument against the office proposed. It fixes the status of the governor's successor and does away with a special election to fill a vacancy." On March 6, 1913, Amendment 6 to the 1874 constitution was proposed by the General Assembly. *See* 1913 Ark. Acts 1527. Amendment 6 was submitted to, and approved by, the voters at the 1914 general election. *See Combs* v. *Gray*, 170 Ark. 956, 281 S.W. 918 (1926), for additional history of the adoption.

Amendment 6, section 4 provides: "In the case of the [resignation] of the Governor, . . . the powers and duties of the office, shall devolve upon the Lieutenant Governor for the residue of the term. . . ." In interpreting constitutional amendments, we have said that a court, in order to determine the meaning and the extent of coverage of a constitutional amendment, may look to the history of the times and the condition existing at the time of the adoption of the amendment in order to ascertain the mischief to be remedied and the remedy adopted. *Huxtable* v. *State*, 181 Ark. 533, 26 S.W.2d 577 (1930). "Amendments to a constitution are not regarded as if they had been parts of the original instrument but are treated as having a force superior to the original to the extent to which they are in conflict." *Grant* v. *Hardage*, 106 Ark. 506, 509, 153 S.W. 826, 827 (1913). Repeal by implication is accomplished when a constitutional amendment takes up a whole subject anew and covers the entire subject matter of the original constitution. *McCraw* v. *Pate*, 254 Ark. 357, 494 S.W.2d 94 (1973); *Berry* v. *Gordon*, 237 Ark. 547, 376 S.W.2d 279 (1964); *Pulaski County* v. *Downer*, 10 Ark. 588 (1850). Further, a constitutional amendment is to be interpreted and understood in its most natural and obvious meaning. *Carter* v. *Cain*, 179 Ark. 79, 14 S.W.2d 250 (1929).

Amendment 6 took up a new subject matter of gubernatorial succession. The citizens wanted to prevent any more gubernatorial succession crises and sought to change the procedure previously set out in article 6. It is impossible to reconcile the natural and obvious meaning of the language of the amendment, quoted above, with the special election procedure set out originally in article 6, section 14 in the factual situation before us. If the appellant Attorney General's suggested meaning were

adopted, and we construed "residue of the term" to only mean the Lieutenant Governor takes office only until the next special election, the constitutional amendment would, in part, amount to an exercise in futility. For these reasons, we hold that amendment 6, section 4 provides that the Lieutenant Governor serves as Governor for the residue of the term and not merely until a new Governor is elected at a special election.

We do not decide whether the special election process set out in article 6 is still viable if the Lieutenant Governor becomes Governor and then vacates the office. That issue is not before us.

The trial court ruled that the "powers and duties of the Office of Governor, but not the Office of Governor" devolved upon the Lieutenant Governor. The trial court's ruling was undoubtedly based on our decision in *Futrell v. Oldham*, 107 Ark. 386, 155 S.W. 502 (1913), and certainly that case contains language stating that, under article 6, the President of the Senate exercised the powers of the Office of Governor, but did not actually become Governor. For several reasons, we think the holding of *Futrell* should be distinguished when the Governor resigns and his place is taken by the Lieutenant Governor under the provisions of amendment 6.

First, the framers of amendment 6 took verbatim from article 6, section 10 of the 1868 constitution the phrase "the powers and duties of the office shall devolve upon the Lieutenant Governor," and they did so without having the opportunity to read this court's opinion in *Futrell*. The House Joint Resolution proposing amendment 6 was adopted on March 6, 1913, eighteen days before this court handed down the decision in *Futrell* on March 24, 1913.

Second, in deciding *Futrell*, this court was obviously concerned that the President of the Senate had never been elected by a direct statewide vote—he had been directly elected only by the voters of a local state Senate district. The opinion provides:

> The central thought [of article 6, sections 12, 13, and 14] is, that the office of Governor is never to be filled at all except by the direct vote of the people themselves, and provision is made by the Constitution for only a temporary devolution of the duties and emoluments of the office upon

some other functionary while a vacancy exists.

107 Ark. at 394, 155 S.W. at 505. Under amendment 6, section 2, the Lieutenant Governor is now elected by a direct statewide vote of the people at the same time and for the same term as the Governor.

An equally important distinguishing factor is that today, under amendment 6, section 2, the Lieutenant Governor is a member of the executive branch of the government, but under article 6, as interpreted in *Futrell* v. *Oldham*, the President of the Senate was a member of the legislative branch and remained such while performing the duties of governor only until an election could be called. The opinion provides:

> So, if the person discharging for the time being the duties of Governor is still President of the Senate, he cannot be Governor. He may exercise the powers of the latter office — "exercise the office of Governor," as it is otherwise expressed in another section, but he does not fill the two offices.

107 Ark. at 391, 155 S.W. at 504.

■ Under amendment 6 we are not faced with the same problem. In fact, allowing the Lieutenant Governor to succeed to the Office of Governor eliminates the separation of powers and the dual office-holding problems. If the Lieutenant Governor were not to assume the Office of Governor, he would act as Governor and still preside over the Senate and have the power to cast votes in the event of tie votes. This mixing of executive and legislative powers is avoided when the Lieutenant Governor assumes the Office of Governor and sheds the duties of Senate President. For these reasons, *Futrell* v. *Oldham* is distinguished.

Amendment 6, section 4 provides that if the Office of Governor becomes vacant, "the powers and duties of the office, shall devolve upon the Lieutenant Governor for the residue of the term." The next section of the amendment, section 5, provides that if the offices of both Governor and Lieutenant Governor become vacant, the President (pro tempore) of the Senate "shall act as Governor until the vacancy [is] filled." Similarly, the Speaker of the House "shall act as Governor until the vacancy be filled" if the President of the Senate becomes unable to act as

Governor. The difference in language suggests that the Lieutenant Governor, unlike the President (pro tempore) of the Senate or the Speaker of the House, does not merely act as Governor when the Governor resigns. Rather, it suggests that he becomes the Governor.

It is also of some persuasion that for nearly three-quarters of a century the executive branch has treated a lieutenant governor as governor when he filled a vacant governor's office. The first instance occurred in 1926 when Lieutenant Governor Harvey Parnell succeeded Governor John E. Martineau. *Historical Report of the Secretary of State-Arkansas* 230 (1978). It also occurred when Governor Dale Bumpers resigned from the Office of Governor and Lieutenant Governor Bob Riley was commissioned governor, as well as when Governor David Pryor resigned and Lieutenant Governor Joe Purcell was commissioned as Governor. See Commissions in Secretary of State's Office. In addition, we are persuaded that the drafters of amendment 6, and the voters who approved it, knew that article 6, section 2 would remain in place. It provides: "The supreme executive power of the State shall be vested in a chief magistrate, who shall be styled 'the Governor of the State of Arkansas.'"

■ Accordingly, we hold that amendment 6, section 4 provides that upon the resignation of the Governor, the Lieutenant Governor becomes "the Governor of the State of Arkansas."

■ One of the parties advanced the argument that amendment 29 of the Constitution of Arkansas requires the Lieutenant Governor to appoint a new governor. We summarily reject the argument and hold that amendment 6 specifically provides for filling a vacancy in the Office of Governor.

Affirmed on direct appeal and reversed on cross-appeal.

GLAZE and CORBIN, JJ., dissent in part and concur in part.

TOM GLAZE, Justice, concurring in part and dissenting in part. I concur in part and dissent in part. My disagreement with the majority court has nothing to do with its holding on the merits. In fact, I totally agree with its decision as it pertains to the merits, but disagree that this court procedurally reached the merits.

This lawsuit is a declaratory judgment action and, as such,

requires that a present actual controversy must exist. In stating this well-recognized principle, this court stated the following:

> The Declaratory Judgment Statute is applicable *only where there is a present actual controversy, and all interested persons are made parties, and only where justiciable issues are presented.* It does not undertake to decide the legal effect of laws upon a state of facts which is future, contingent or uncertain. A *declaratory judgment will not be granted* unless the danger or dilemma of the plaintiff is present, not *contingent on the happening of hypothetical future events*; the prejudice to his position must be actual and genuine and not merely possible, speculative, contingent, or remote. (Emphasis added.)

*Andres* v. *First Ark. Development Finance Corp.*, 230 Ark. 594, 324 S.W.2d 97 (1959); *see also Files* v. *Hill*, 268 Ark. 106, 594 S.W.2d 836 (1980); *McFarlin v. Kelly*, 246 Ark. 1237, 442 S.W.2d 183 (1969).

Justice John A. Fogelman stated the following reasons for the foregoing rule in a concurring opinion where he said:

> The declaratory judgment act is not intended to be the vehicle for advisory opinions to persons not having a justiciable controversy with their apparent adversaries by a court having no jurisdiction. It is far better, in my opinion, that important questions, particularly constitutional ones, be pounded out on the anvil of advocacy by persons whose interests are vitally real, not academic, with all interested parties before the court.

*Block* v. *Allen*, 241 Ark. 970, 980, 411 S.W.2d 21, 27 (1967).

Let me first point out the obvious — Governor Bill Clinton is *not* a party to this declaratory judgment action. Second, nowhere in the record before this court is it shown that the Governor has resigned or that he intends to resign his office. In an attempt to circumvent this obvious procedural defect in parties and the record, the parties appear to rely upon the Democratic Party of Arkansas's brief wherein it argues as follows:

> The fact that Governor Clinton's exact resignation date may not be known is not a bar to determining the

succession issue. Governor Clinton cannot serve both as Governor and President. Article 6, Section 11 of the Arkansas Constitution provides that no "person holding office under the authority of this State, or of the United States, shall exercise the office of Governor, except as herein provided." Governor Clinton's resignation now that he has been elected President cannot be doubted. Governor Clinton will resign no later than January 20, 1993, in order to assume the Presidency. Thus, it is assured that there will be a vacancy in the Governor's office no later than 58 days after November 23rd. The resulting vacancy in the office of Governor is hardly the hypothetical fact situation feared by the courts.

The parties to this lawsuit *cannot* stipulate or assume how a person not a party or witness in this case might act in the future; namely, that Governor Clinton will vacate the Governor's office. The majority court is wrong in allowing the parties to make such a stipulation, especially when this factual issue could have been resolved by having made the Governor a party to this action and his resignation could then have been easily confirmed. Nor was the Governor deposed or called as a witness so the resignation issue could be put to rest. Clearly, Governor Clinton has an interest in this cause since this case affects not only his duties and responsibilities as governor, but also involves the emoluments he receives from that office. Until the Governor resigns, the succession issue presented in this cause remains purely hypothetical and contingent upon his vacating the office of Governor.

In an obvious attempt to avoid the Governor's absence in this lawsuit and to cure a record failing to reflect the Governor's resignation, the Democratic Party cites Article 6, Section 11 of the Arkansas Constitution which is captioned "Incompatible Offices" and provides, "No member of Congress, or other person holding office under the authority of this State, or of the United States, shall exercise the office of Governor, except as herein provided." In citing this constitutional language, the Party concludes the Governor's resignation now that he has been elected President cannot be doubted. Of course, this is an assumption or conclusion the parties to this action are unable to make. Clearly, the above constitutional language does not mean Governor Clinton automatically resigns or vacates his office upon

being sworn in as President. In addition, such dual officeholder issues are decided in quo warranto or ouster, not declaratory judgment, proceedings.

My natural inclination is much like the majority court's and the parties in this case — that (1) the Governor likely will resign sometime prior to January 20, 1993, (2) a vacancy will then exist and (3) the succession problem will be a reality. However, to indulge in this assumption on the actual facts of this case is to ignore an entire body of law that provides this court only grants declaratory judgment relief when a *present actual controversy exists and all interested persons ar made parties*. This court's apparent willingness to address the hypothetical facts present here breaks with clear, prior precedent and, in my view, will permit parties henceforth to stipulate to future facts and events in order to obtain declaratory relief and advisory opinions. This court, instead, should require the presence of Governor Clinton in this lawsuit either as a party or a witness, so a finding as to his resignation from or vacating of office can be established. Only then will an actual controversy exist, allowing this court to decide the succession issue.

One last point — the Democratic Party, recognizing justiciability as a problem, asserts this court nevertheless can declare the law concerning the Governor-succession issue because this is a case of extreme public importance. In support of this assertion, it cites *Robinson* v. *Arkansas Game and Fish Commission*, 263 Ark. 462, 565 S.W.2d 433 (1978); *Moorman* v. *Taylor*, 227 Ark. 180, 297 S.W.2d 103 (1957); and *Rockefeller* v. *Purcell*, 245 Ark. 536, 434 S.W.2d 72 (1968). Suffice it to say, each of these cases, unlike the present case, once involved a justiciable controversy, but the actual controversy later became moot for one reason or another. Here, as already discussed, an actual controversy is yet to occur. The cases cited are simply not on point.

For the reasons above, I would reverse.

CORBIN, J., joins.