Debra Asbury, Director Arkansas Assessment Coordination Department 1614 West Third Little Rock, Arkansas 72201-1815
Dear Ms. Asbury:
I am writing in response to your request for my opinion regarding several questions you have posed regarding assessment of real property in the wake of its transfer by sale. Specifically, you have asked the following:
 ACA 26-26-1123(a) provides that when a person (any person) sells his or her real property the assessor shall assess the property at 20% of appraised value at the next assessment date after the transfer. Subsection (b) provides that the owner (any owner) of real property to whom title is transferred is not entitled to claim any limitation on the assessed value of the real property until the second assessment date after the date of the transfer. Do either of the cited provisions of this statute conflict with the provisions of Amendment 79 Subsection (1)(b)(1) and Subsection (1)(c)(1)? These subsections provide that the respective ten percent (10%) and five percent (5%) limitations on assessed value occur on the first assessment following reappraisal.
 If they do conflict, can the provisions be reconciled?
 In addition, is there a conflict between the same Subsections, (1)(b)(1) and (1)(c)(1) of Amendment 79 and ACA 26-26-1120(b)(1)? This subsection of the statute provides that when a disabled person or a person sixty-five (65) years of age or older sells his or her real property, the purchaser shall not be entitled to claim any reduction to the real property's assessed value. Subsection two (2) thereof provides that on or after January 1 of the year following the date of the sale, the county assessor shall assess the real property at its full market value, unadjusted for assessment limitation required by Arkansas Constitution, Amendment 79.
 If they do conflict, can the provisions be reconciled?
RESPONSE
I am unable definitively to answer your first question because of ambiguities in the text of Amendment 79 regarding the effects of selling property upon the applicability of the constitutional caps to post-purchase assessments. I must note, however, that legislation will be presumed constitutional and that the General Assembly's enactments will be given great deference if challenged. Amendment 79 at no point mentions the effect of a sale upon an assessment. Subsection 1(a) of the amendment suggests that the caps will apply to any parcel of real property following a reappraisal — language that might be read as meaning that the fact of a sale is immaterial in applying the recited caps on annual assessment increases. However, the amendment refers at other points to "a taxpayer" or "the taxpayer" as being subject to the caps — coinages that might be read as suggesting that the legislature can mandate an assessment at full market value when a new purchaser acquires the property, following which any applicable caps would apply to the purchasing taxpayer. Judicial clarification appears warranted.
With respect to your second question, I believe there is probably no conflict between Amendment 79 and A.C.A. § 26-26-1120(b)(1). Subsection 1(d) of Amendment 79 freezes assessments for the disabled and persons 65 years of age or older at the rate in effect on the date of purchase or construction of their homesteads or, if applicable, at any subsequent lower assessed rates. In my opinion, the voters did not intend that a purchaser of such property who is not himself disabled or elderly should be assessed based upon the previous owner's frozen rate of assessment. Rather, on the first assessment date following the purchase, I believe the buyer should be assessed based upon the full appraised value of the property, following which any applicable caps should apply. However, judicial clarification on this issue likewise appears warranted.
Question 1: ACA 26-26-1123(a) provides that when a person (any person) sells his or her real property the assessor shall assess the property at 20% of appraised value at the next assessment date after the transfer. Subsection (b) provides that the owner (any owner) of real property to whom title is transferred is not entitled to claim any limitation on the assessed value of the real property until the second assessment date after the date of the transfer. Do either of the cited provisions of this statute conflict with the provisions of Amendment 79 Subsection (1)(b)(1) and Subsection (1)(c)(1)? These subsections provide that the respective ten percent (10%) and five percent (5%) limitations on assessed value occur on the first assessment following reappraisal.
If they do conflict, can the provisions be reconciled?
As discussed below, I cannot definitively answer this question because of certain ambiguities in the text of Ark. Const. amend 79.
Section 26-26-1123 of the Arkansas Code (Supp. 2007), captioned "Sale of real property," provides as follows:
 (a) When a person sells his or her real property, the county assessor shall assess the real property at twenty percent (20%) of the appraised value at the next assessment date after the date of the transfer of title to the real property.
 (b) The owner of real property to whom title is transferred by a sale is not entitled to claim any limitation on the assessed value of the real property until the second assessment date after the date of the transfer of title to the real property.
 (c) This section does not apply to any transfer of title to real property claimed as a homestead in which the owner or beneficiary of the homestead retains a life-estate interest in the homestead following the transfer of title to the real property.
As your question suggests, this statute provides on its face that, with the exception of instances in which the owner or beneficiary of a homestead retains a life estate in the homestead, a purchaser of real property will be assessed at 20% of the full appraised value of the property at the time of the first assessment following the sale. As your question further suggests, subsection (b) of this statute provides that a purchaser will not be entitled to claim any limitations on the assessed value of his property until the time of the second assessment following the sale.
You have specifically asked about the interplay between this statute and the following constitutionally mandated provisions of Ark. Const. amend. 79, § 1, which provides the following property-tax relief effective January 1, 2001:
 (a) After each county-wide reappraisal, as defined by law, and the resulting assessed value of property for ad valorum [sic] tax purposes and after each Tax Division appraisal and the resulting assessed value of utility and carrier real property for ad valorem tax purposes, the county assessor, or other official or officials designated by law, shall compare the assessed value of each parcel of real property reappraised or reassessed to the prior year's assessed value. If the assessed value of the parcel increased, then the assessed value of the parcel shall be adjusted pursuant to this section.
 (b)(1) If the parcel is not a taxpayer's homestead used as the taxpayer's principal place of residence, then for the first assessment following reappraisal, any increase in the assessed value of the parcel shall be limited to not more than ten percent (10%) of the assessed value of the parcel for the previous year. In each year thereafter the assessed value shall increase by an additional ten percent (10%) of the assessed value of the parcel for the year prior to the first assessment that resulted from reappraisal but shall not exceed the assessed value determined by the reappraisal prior to adjustment under this subsection. For utility and carrier real property, any annual increase in the assessed value of the parcel shall be limited to not more than ten percent (10%) of the assessed value for the previous year.
 * * *
 (c)(1) Except as provided in subsection (d), if the parcel is a taxpayer's homestead used as the taxpayer's principal place of residence then for the first assessment following reappraisal, any increase in the assessed value of the parcel shall be limited to not more than five percent (5%) of the assessed value of the parcel for the previous year. In each year thereafter the assessed value shall increase by an additional five percent (5%) of the assessed value of the parcel for the year prior to the first assessment that resulted from reappraisal but shall not exceed the assessed value determined by the reappraisal prior to adjustment under this subsection.
As a preliminary matter, I will note that in analyzing the interplay between these statutory and constitutional provisions, I am guided by the following:
 Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. Ford v. Keith, 338 Ark. 487, 996 S.W.2d 20 (1999); ACW, Inc. v. Weiss, 329 Ark. 302, 947 S.W.2d 770 (1997). If it is possible to construe a statute as constitutional, we must do so. Jones v. State, 333 Ark. 208, 969 S.W.2d 618
(1998). In construing a statute, we will presume that the General Assembly, in enacting it, possessed the full knowledge of the constitutional scope of its powers, full knowledge of prior legislation on the same subject, and full knowledge of judicial decisions under preexisting law. McLeod v. Santa Fe Trail Transp. Co., 205 Ark. 225, 168 S.W.2d 413 (1943). We must also give effect to the legislature's intent, making use of common sense and giving words their usual and ordinary meaning. Kyle v. State, 312 Ark. 274, 849 S.W.2d 935 (1993).
Bunch v. State, 344 Ark. 730, 736, 43 S.W.3d 132 (2001). Moreover, the legislature has the absolute power to legislate, unless prohibited from doing so by the constitution, either expressly or by necessary implication. Black v. Cockrill, 239 Ark. 367, 369, 389 S.W.2d 881
(1965). However, notwithstanding the foregoing, it is well established that constitutional provisions, including amendments, take precedence over any law passed by the legislature. Gravett v. Villines,314 Ark. 320, 326, 862 S.W.2d 260 (1993).
As my immediate predecessor pointed out in the attached Op. Att'y Gen. No. 2004-300: "Amendment 79 at no point mentions a purchase of property as either triggering or foreclosing application of a 10% or a 5% cap." (Footnote omitted.) As discussed at length by my predecessor, it is not entirely clear whether the voters, in adopting Amendment 79, intended "only to spare individual taxpayers who hold their property over time from drastic increases from one reappraisal to the next or whether the voters intended to restrict such increases to parcels of property, irrespective of possible changes in ownership, during the period between reappraisals." The rationale underlying §§ 1(b)(1) and 1(c)(1) of Amendment 79 appears clear: in adopting these constitutional provisions, the people intended to mitigate the effects of any drastically increased appraisal by capping the increase in each subsequent assessment until the assessment indeed equals 20% of the newly appraised value. At issue, however, is whether the voters intended only to spare from "sticker shock" those individual homesteaders whose property had not been reappraised for a significant period of time and whose post-reappraisal unadjusted assessments would be significantly increased or, on the other hand, whether the voters simply wanted to limit annual increases on any given parcel of property based upon the Amendment 79 caps. If the former reading of Amendment 79 is correct, the legislature may well have been justified in declaring that a buyer would be assessed at a full 20% of appraised value on the assessment date following the sale. If the latter reading is correct, the legislature may have exceeded its authority in mandating any such rate of assessment immediately following a sale.
Although I am inclined to lean toward the former reading of the statute, I am not prepared to subscribe to it as inevitable. Amendment 79 never mentions the effects of a sale, and it prefaces its mandates regarding caps by declaring that the caps will apply to all qualifying parcels of property, not merely to those parcels that remain owned by the one individual who owned the parcel on the date of the last reappraisal. Nevertheless, I question whether the voters intended to spare from assessment "sticker shock" a buyer who by law is presumed to know that, pursuant to A.C.A. § 26-26-1123(b), his property will be assessed at its full appraised value on the next assessment date following the sale. See State v. Kelley, 362 Ark. 636, 645,210 S.W.3d 93 (2005) ("We have long recognized that every person is presumed to know the law, whether civil or criminal."). It remains the case, however, that Amendment 79 is unclear regarding whether a parcel may be reassessed in between reappraisals based upon the fact of its having been conveyed to another taxpayer during that period.
My predecessor explained the issue in this regard as follows:
 Subsection 1(a) of Amendment 79 initially addresses the issue of adjusting assessments purely with reference to the reappraised value of the parcel, mandating that the formula for adjusting assessments set forth in the rest of section 1 will apply if the assessed value of the parcel increased as a result of the reappraisal. Subsection 1(a) at no point addresses what happens if an individual owner transfers the property to another taxpayer. This subsection only directs that if the reappraisal reflects that the value of the parcel has increased, "the assessed value of the parcel shall be adjusted pursuant to this section." This directive thus leaves open the question of whether a conveyance of ownership might matter in determining what adjustment, if any, will occur.
 On the other hand, subsections 1(b)(1) and 1(c)(1), which impose the 10% cap and the 5% cap respectively, both preface their formulas for computing assessed value for purposes of taxation by noting that the test for determining which formula will apply is whether the property is "a taxpayer's homestead." Unfortunately, these subsections fail to specify whether the reference in these sections to "a taxpayer" is specific or generic — i.e., whether "a" means "one" or "a" means "any" in identifying the "taxpayer" entitled to the benefit of the caps on a particular parcel following a reappraisal.[1]
If it is the former, the caps might be deemed to apply only so long as the owner of the property at the time of the last preceding reappraisal maintains possession, following which the assessment applied to a purchaser will reflect true market value pending a new reappraisal. If it is the latter, regardless of how often the property changes hands, its assessed value will be determined by applying the applicable cap to the parcel in question.
Op. Att'y Gen. No. 2004-300, at 6.
In matters relating to constitutional amendments, the intent of the people is controlling. Bailey v. Abington, 201 Ark. 1072,149 S.W.2d 573, 148 S.W.2d 176 (1941). See also Faubus v. Kinney,239 Ark. 443, 389 S.W.2d 887 (1965). The Arkansas Supreme Court has stated that in interpreting constitutional provisions, it may be helpful to determine what changes the constitutional amendment was intended to make and the history of the times and conditions existing at the time of adoption. State v. Oldner, 361 Ark. 316, 79 S.W.3d 831 (2005); ACW, Inc. v. Weiss, 329 Ark. 302, 947 S.W.2d 770 (1997); and Bryant v. English,311 Ark. 187, 843 S.W.2d 308 (1992). The court should constantly keep in mind the object sought to be accomplished by an amendment's adoption, and the evils, if any, sought to be prevented or remedied, and effect should be given to the purpose indicated by a fair interpretation of the language used. Bailey, supra at 1078-79. The court will endeavor to effectuate as nearly as possible the intent of the people in passing the measure, and, if necessary, as a means of attaining that end, a liberal interpretation will be warranted. Pakay v. Davis, 367 Ark. 421, 241 S.W.3d 257 (2006). The intention is to be gathered from both the letter and the spirit of the instrument. See Bailey v. Abington, supra and State v. New York Life Ins. Co., 119 Ark. 314, 173 S.W. 1099 (1915). As noted in Brewer v. Fergus, 348 Ark. 577, 583, 79 S.W.3d 831 (2002), the words of the constitution should ordinarily be given their obvious and natural meaning. A court must therefore ascertain the "natural signification" of the words used. Carter v. Cain, 179 Ark. 79, 14 S.W.2d 250 (1929).
In addition, long-standing executive and legislative interpretation of constitutional provisions will be afforded some weight by the courts when such provisions are ambiguous. It has been stated that "[l]ong-continued contemporaneous and practical interpretation of a statute by the executive officers charged with its administration and enforcement, the courts, and the public constitutes an invaluable aid in determining the meaning of a doubtful statute." Sutherland, Statutory Construction, § 49.03 6th ed. The Arkansas Supreme Court has stated that: "[l]egislative interpretation of constitutional provisions is never binding on the courts, but, if there is any doubt or ambiguity, it is persuasive and entitled to some consideration." Mears, County Judge v. Hall, 263 Ark. 827, 835, 569 S.W.2d 91(1978), citing Griffin v. Rhoton, 85 Ark. 89, 107 S.W. 380 (1907). It has also been stated, however, that "[l]egislative and/or Executive interpretations are to be given consideration only when the Constitutional provision is ambiguous." Parkin Printing Stationary Co. v. Arkansas Printing and Lithograph Co., 234 Ark. 697, 706, 354 S.W.2d 560 (1962).
Unfortunately, the text of Amendment 79 provides little guidance regarding whether the voters intended the specific or the generic reading of the term "a" in referencing the "taxpayer" entitled to a tax benefit between reappraisals.[2] The only arguable textual support for one reading over the other is indirect. In support of the proposition that one should read the term "a" as designating any taxpayer who owns property, whether as a homestead or not, during the period between reappraisals, it may be significant that the listed varieties of property not subject to an annual cap in assessments — namely, newly discovered real property, new construction and substantial improvements to real property — do not include property conveyed following the most recent reappraisal. See Ark. Const. amend. 79, §§ 1(b)(2) and 1(c)(2). Although one might interpret this omission as meaning that conveyed property will be subject to any cap that would have applied if the purchaser had owned the property at the time of the most recent reappraisal, I consider this conclusion far from inevitable. Indeed, this conclusion would appear to beg the question, since one could just as readily conclude, if one reads the term "a" in subsections 1(b)(1) and 1(c)(1) of Amendment 79 as designating "one" rather than "any," that listing conveyed property among property not subject to a cap on assessment increases in subsections 1(b)(2) and 1(c)(2) would be redundant and hence unnecessary.
It is not entirely clear, then, whether the sale of a parcel necessarily triggers a lifting of the Amendment 79 caps or, for that matter, whether legislation mandating the lifting of those caps would pass constitutional muster if challenged. As my predecessor discussed, the history of Amendment 79 provides little guidance in resolving this dispute. As noted above, judicial clarification appears warranted.
The resolution of this question has clear implications for determining whether — and, possibly when — the Amendment 79 caps might foreclose application of the formula set forth in A.C.A. § 26-26-1123(a). Assuming, without attempting to resolve, that "a" means "any" as used in Amendment 79 — i.e., that a change of ownership would have no effect on the statutory caps in effect pending a new reappraisal — I believe the statute and the constitution would appear to be irreconcilable inasmuch as the amendment dictates a formula at odds with the statutory formula. On the other hand, if "a" is interpreted to mean "one," the statute would in all likelihood withstand a constitutional challenge as serving an implied public purpose of relieving existing property owners, as distinct from new purchasers, from wild fluctuations in their assessments following a reappraisal. However, as discussed above, the amendment is sufficiently ambiguous that I cannot opine with confidence what the voters intended. I can simply reiterate that a statute will be presumed constitutional until it is successfully challenged.
Question 2: In addition, is there a conflict between the same Subsections, (1)(b)(1) and (1)(c)(1) of Amendment 79 and ACA26-26-1120(b)(1)? This subsection of the statute provides that when a disabled person or a person sixty-five (65) years of age or older sells his or her real property, the purchaser shall not be entitled to claim any reduction to the real property's assessed value. Subsection two (2) thereof provides that on or after January 1 of the year following the date of the sale, the county assessor shall assess the real property at its full market value, unadjusted for assessment limitation required by Arkansas Constitution, Amendment 79.
If they do conflict, can the provisions be reconciled?
In my opinion, although the issue invites judicial clarification, the statutory and constitutional provisions recited in your question in all likelihood do not conflict.
Subsection 26-26-1120(b) of the Code (Supp. 2007) provides:
 (1) When a disabled person or a person sixty-five (65) years of age or older sells his or her real property, the purchaser shall not be entitled to claim any reduction to the real property's assessed value.[3]
 (2) On or after January 1 of the year following the date of the sale, the county assessor shall assess the real property at its full market value, unadjusted for assessment limitations required by Arkansas Constitution, Amendment 79.
I believe you have accurately summarized in your question the upshot of this statute. The apparent purpose of the statute is to ensure that property that has been assessed, possibly for a long period of time, at a frozen rate pursuant to § 1(d)(1) of Amendment 79, be assessed at its full appraised value when the conditions that had qualified the property owner for a frozen rate have been lifted by virtue of a subsequent sale. At issue, then, is whether the constitution permits the legislature to impose such a condition.
My analysis of this question is somewhat different than that in response to your first question. As I have previously noted, § 1(d) of Amendment 79 freezes assessments on the homestead of any disabled or elderly person at the rate in effect on the date of his purchase or construction of the property or at any lower future assessed rate. In my opinion, this provision was clearly intended to afford qualifying individuals an enhanced degree of property tax relief over and above the 5% cap on annual increases on assessments available to other homesteaders. I do not believe the voters intended that a purchaser of property who is not disabled or elderly should be entitled to capitalize on the condition of the seller — namely, his disability or advanced age — to restrict the buyer's annual increase in assessments to 5% above what the disabled or elderly seller was paying. Rather, I believe the legislature was in all likelihood justified in mandating that the buyer be assessed based upon the full appraised value of the property in the year following the date of the purchase. In following years, of course, the 5% cap should apply. In this regard, then, I believe the condition of the buying taxpayer should factor into the determination as to what the initial assessment of the parcel should be. See n. 3 supra.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] As my predecessor noted in a footnote to this observation:In State v. Martin, 60 Ark. 343, 353, 30 S.W. 421 (1895) the court remarked:According to Mr. Webster, "a" means one or any, but less "emphatically than either." It may mean one where only one is intended, or it may be any one of a great number. That is the trouble. Of itself, it is in no sense a term of limitation. Mr. Webster also says: "It is placed before nouns of the singular number, denoting an individual object, or quality individualized." Quality is defined as (1) "the condition of being of such a sort as distinguished from others; (2) special or temporary character, profession, occupation." See Ark. Op. Att'y Gen. No. 90-015 (discussing and applying this definition).
[2] In a footnote to this observation, my predecessor further explained:My use of the term "the" in this sentence to modify "taxpayer" tracks the language of Amendment 79, which twice acknowledges that the operative inquiry in determining whether property will be subject to a 10%- or 5%-increase cap is whether the property is "a taxpayer's homestead used as the taxpayer's principal place of residence. . . ." Ark. Const. amend. 79 §§ 1(b)(1) and 1(c)(1). Although I agree with one of my predecessors that the article "the" is one of limitation, specifying only one particular referent, see Ark. Op. Att'y Gen. No.97-040, I do not believe this conclusion bears on the distinct question of whether the antecedent article "a" in Amendment 79 designates "one" or "any."
[3] In Op. Att'y Gen. No. 2004-300, my immediate predecessor offered the following analysis regarding a possible constitutional restriction on the scope of this statute:I will opine that the quoted provision would survive constitutional challenge with respect to any purchaser who is himself disabled or over the age of 65 only if read as being qualified by subsection 1(d)(1)(A) of Amendment 79, which provides:A homestead used as the taxpayer's principal place of residence purchased or constructed on or after January 1, 2001 by a disabled person or by a person sixty-five (65) years of age or older shall be assessed thereafter based on the lower of the assessed value as of the date of purchase or construction or a later assessed value.(Emphasis added.) It appears clear on the face of this provision that if a person who is disabled or over 65 buys a homestead from a seller who is likewise disabled or over 65, the buyer will be entitled to the same reduction as was the seller. Notwithstanding the statute's silence on this issue, I do not believe that the legislature intended to include such a buyer within the scope of the statute.I concur in my predecessor's conclusion. *Page 1